IN THE SUPREME COURT OF NORTH CAROLINA

No. 267PA21

Filed 31 January 2025

STATE OF NORTH CAROLINA

v.

FRANCISCO EDGAR TIRADO

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA20-213 (N.C. Ct. App. June 15, 2021), affirming judgments entered on 30 August 2019 by Judge James F. Ammons Jr. in Superior Court, Cumberland County. Heard in the Supreme Court on 25 September 2024.

*Jeff Jackson, Attorney General, by Heidi M. Williams, Special Deputy Attorney General, for the State-appellee.*

*Kellie Mannette for defendant-appellant.*

NEWBY, Chief Justice.

In this case we consider whether the Court of Appeals denied merits review of defendant's constitutional challenge to his consecutive sentences of life imprisonment without parole (life without parole) under Article I, Section 27 of the North Carolina Constitution. The Court of Appeals comprehensively addressed all of defendant's arguments, including his constitutional challenge. Because federal courts have interpreted the Eighth Amendment to the United States Constitution to provide

greater protections for juvenile offenders than our state constitution's plain text affords, this Court locksteps its application of Article I, Section 27 with that of the Eighth Amendment to ensure that no citizen is afforded lesser rights. Thus, the Court of Appeals did not need to separately consider defendant's claim under the North Carolina Constitution. Finally, because this Court's decision in *State v. Kelliher*, 381 N.C. 558, 873 S.E.2d 366 (2022), does not apply to defendant's case, the resentencing order in this case does not run afoul of that decision. Accordingly, we affirm the decision of the Court of Appeals.

## I.    Background & Procedural History

Defendant's violent crimes were thoroughly discussed in his first appeal to this Court. *State v. Tirado* (*Tirado I*), 358 N.C. 551, 559–62, 599 S.E.2d 515, 522–24 (2004). In short, in August of 1998, defendant was seventeen years old and a member of the notorious Crips gang. On the night of 16 August 1998, and in the early morning hours of 17 August 1998, defendant actively participated with eight other gang members in the abduction and robbery of three women and the murder of two of them. Defendant attempted to murder the third woman, volunteering to shoot her and expressing disappointment when his gang leader chose another gang member to carry out the execution. Fortunately, the gang member's attempted murder was unsuccessful, and the third woman survived.

Law enforcement arrested defendant, and a grand jury indicted him on numerous charges, including two counts of first-degree murder. On 3 April 2000, a

jury found defendant guilty on all charges, and it convicted him of first-degree murder based on premeditation and deliberation as well as the felony-murder rule. Upon the jury's recommendation, the trial court sentenced defendant to death. Defendant appealed, and this Court vacated defendant's death sentence and remanded for resentencing because of an error in the trial court's poll of the jury. *Id.* at 583–85, 604, 599 S.E.2d at 537–38, 549.[1]

Thereafter, the Supreme Court of the United States held that the Eighth Amendment forbids sentencing juvenile criminal offenders to death, *Roper v. Simmons*, 543 U.S. 551, 575, 578, 125 S. Ct. 1183, 1198, 1200 (2005), so the trial court resentenced defendant to two consecutive, statutorily mandated sentences of life without parole, *see generally* N.C.G.S. § 14-17 (2007). The Supreme Court subsequently held that the Eighth Amendment also prevents sentencing schemes that mandate sentencing juvenile murderers to life without parole. *Miller v. Alabama*, 567 U.S. 460, 465, 470, 479, 489, 132 S. Ct. 2455, 2460–61, 2464, 2469, 2475 (2012). In *Miller*, however, the Supreme Court explained that sentencing schemes that give the trial court discretion to choose between life without parole or a lesser sentence are permissible because they enable trial courts to distinguish

---

[1] For each of defendant's twelve other felony convictions, the trial court sentenced him to terms of imprisonment and ordered them to be served consecutively. In his initial appeal to this Court, defendant challenged some of these sentences. *Tirado I*, 358 N.C. at 578, 599 S.E.2d at 534. This Court overruled his assignment of error, however, *id.* at 579, 599 S.E.2d at 534, vacating only his death sentence and remanding for a new capital sentencing proceeding, *id.* at 604, 599 S.E.2d at 549. The present appeal concerns only the life without parole sentences imposed on defendant for his first-degree murder convictions.

between juveniles likely to change and those unlikely to be rehabilitated. *Id.* at 465, 479–80, 132 S. Ct. at 2460, 2469. The Supreme Court stated that sentencing juveniles to life without parole would be "uncommon," imposed upon only "the rare juvenile offender *whose crime* reflects irreparable corruption." *Id.* at 479–80, 132 S. Ct. at 2469 (emphasis added) (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197).

Following the Supreme Court's ruling in *Montgomery v. Louisiana* that *Miller* announced a substantive rule of constitutional law that must be applied retroactively on collateral review, 577 U.S. 190, 206, 212, 136 S. Ct. 718, 732, 736 (2016), defendant was granted appropriate relief and resentenced under a new statutory sentencing scheme enacted to comply with *Miller*.[2] This *Miller*-Fix Statute gave trial courts the discretion to determine whether juvenile murderers receive life without parole or the lesser sentence of life imprisonment with parole (life with parole). S.L. 2012-148, § 1, 2012 N.C. Sess. Laws at 713–14 (codified at N.C.G.S. §§ 15A-1340.19B to -1340.19C). In making this determination, the trial court must consider certain enumerated

---

[2] An Act to Amend the State Sentencing Laws to Comply with the United States Supreme Court Decision in Miller v. Alabama, S.L. 2012-148, § 1, 2012 N.C. Sess. Laws 713, 713–14 (codified at N.C.G.S. §§ 15A-1340.19A to -1340.19D) [hereinafter *Miller*-Fix Statute]; *see also* An Act to Make Technical Corrections to the General Statutes and Session Laws, As Recommended by the General Statutes Commission, and to Make Additional Technical and Other Changes to the General Statutes and Session Laws, S.L. 2013-410, § 3(a), 2013 N.C. Sess. Laws 1715, 1716 (codified as amended at N.C.G.S. § 14-17) (deleting section 14-17's mandate to sentence juvenile murderers to life without parole).

mitigating factors along with "[a]ny other mitigating factor or circumstance" (the *Miller* factors). *Id.* at 713 (codified at N.C.G.S. § 15A-1340.19B(c)).[3]

At defendant's resentencing hearing, the trial court considered the sentencing options, mitigating factors, the evidence presented at the resentencing hearing, and transcripts from defendant's trial and original sentencing. The trial court decided to resentence defendant to two consecutive terms of life without parole. The trial court memorialized defendant's sentences in a written order on 16 March 2020. Therein, the trial court made numerous detailed findings of fact about the crimes and defendant's circumstances, thoroughly evaluated the mitigating evidence, and thoughtfully weighed the *Miller* factors. Ultimately, the trial court expressly concluded that defendant's crimes reflected irreparable corruption rather than transient immaturity. The trial court ordered him to serve consecutive sentences of life without parole. Defendant appealed.

At the Court of Appeals, defendant presented four arguments. First, he challenged several of the trial court's findings of fact, and second, defendant argued that the trial court abused its discretion when it considered the *Miller* factors. Third, in light of the foregoing alleged errors, defendant argued that, contrary to the trial court's conclusion, the evidence established that he was not permanently incorrigible or irreparably corrupt. Thus, defendant argued that under *Miller*, his consecutive

---

[3] This Court upheld the *Miller*-Fix Statute's sentencing scheme in *State v. James*, 371 N.C. 77, 99, 813 S.E.2d 195, 211 (2018).

sentences of life without parole violated the Eighth Amendment. For the same reasons, defendant argued that his life without parole sentences violated Article I, Section 27 of the North Carolina Constitution. He also summarily contended that the state constitution provided him "even broader protection" than the Federal Constitution. Fourth, defendant argued that the trial court applied incorrect legal standards.

After briefing, but before the Court of Appeals issued an opinion, the Supreme Court of the United States decided *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). There the Supreme Court held that the Eighth Amendment does not require a trial court to make an express or implicit finding of permanent incorrigibility before sentencing a juvenile murderer to life without parole. *Id.* at 1311, 1313–22.

The Court of Appeals unanimously affirmed defendant's consecutive sentences of life without parole, holding that they withstood scrutiny under both constitutions. *State v. Tirado* (*Tirado II*), No. 20-213, slip op. at 13–14, 17 (N.C. Ct. App. June 15, 2021) (unpublished). The Court of Appeals held that competent evidence supported all challenged findings of fact and that the trial court did not abuse its discretion in its weighing of the *Miller* factors. *Id.* at 8–13. Accordingly, the Court of Appeals rejected defendant's contention that the trial court erred in determining that he was permanently incorrigible or irreparably corrupt. *Id.* at 15. Rather, the Court of Appeals agreed with the trial court, stating that "the evidence shows otherwise." *Id.* The Court of Appeals further concluded that "*Jones* ha[d] no effect on defendant's

sentence[s]." *Id.* at 15; *see also id.* at 14 (similar). The Court of Appeals confirmed that the trial court complied with *Miller*, its progeny, and our General Statutes. *Id.* at 14–15. Moreover, it rejected defendant's argument that his two consecutive sentences of life without parole are unconstitutional per se. *Id.* at 15. Having considered defendant's constitutional challenge from all angles, the Court of Appeals concluded that his sentences were constitutionally compliant. *Id.*[4]

Defendant filed a notice of appeal based upon a constitutional question, arguing that the Court of Appeals misconstrued *Jones* to totally foreclose as-applied constitutional challenges to sentences. Defendant additionally filed a petition for discretionary review, seeking review of the same issue as presented in his notice of appeal. He also advanced a second issue in his petition, arguing that the Court of Appeals erred "in misapplying *Jones*, fail[ing] to consider not just [his] as-applied Eighth Amendment claim, but his claim that his sentence was unconstitutional under the more protective North Carolina Constitution." This Court dismissed defendant's notice of appeal but allowed discretionary review of defendant's second proposed issue. This Court also specifically directed the parties to brief whether defendant's resentencing complied with *State v. Kelliher*, 381 N.C. 558, 873 S.E.2d 366 (2022), which was decided in the interim.

---

[4] The Court of Appeals also held that the trial court applied the correct legal standards, and it rejected defendant's contention that the trial court had improperly compared him to adult offenders. *Tirado II*, slip op. at 15–17.

## II.  Analysis

Defendant asserts that the Court of Appeals erroneously failed to consider his constitutional challenge to his life without parole sentences under Article I, Section 27 of the North Carolina Constitution. To answer this question, we address defendant's contentions (1) that the Court of Appeals should have considered his claim under "the more protective" state constitution and (2) that the Court of Appeals improperly denied merits review of his constitutional challenge to his sentences. Finally, in accordance with this Court's special directive, we consider whether the trial court's order complied with *Kelliher*. Questions of law are reviewed de novo. *E.g.*, *State v. Khan*, 366 N.C. 448, 453, 738 S.E.2d 167, 171 (2013).

### A. Defendant's Assertion That the Cruel or Unusual Punishments Clause Provides "Broader" Protections for Criminal Defendants

We start with defendant's assertion that the Court of Appeals should have conducted an analysis under the state constitution's distinct protections. Defendant sought discretionary review in part because "[t]he Court of Appeals did not consider whether [his] sentence was unconstitutional under Article [I], [Section] 27 of the North Carolina Constitution, *which provides individuals with increased protection.*" (Bolding omitted; italics added.) He expressly argued that "[f]ederal case law on federal protections does not control how this Court interprets our own [c]onstitution" and that "the meaning of 'cruel and unusual punishment' . . . should not limit the meaning of 'cruel or unusual punishment.'" Citing *Jones*, 141 S. Ct. at 1322–23, defendant implored us to heed the Supreme Court's "encourage[ment]" for "States to

apply their own *additional* procedures and safeguards" in juvenile sentencing. (Emphasis added.) Defendant then proclaimed, "North Carolina is one such state, with broader protections against certain punishments, not just for juveniles, but for all criminal defendants." He concluded, "[T]he Court of Appeals, in misapplying *Jones*, failed to consider not just [defendant's] as-applied Eighth Amendment claim, *but his claim that his sentence was unconstitutional under the more protective North Carolina Constitution*." (Emphasis added.)

By claiming that the state constitution provides *more* protection than the Federal Constitution, which already outlaws life without parole sentences for any juvenile other than those whose crimes reflect irreparable corruption or permanent incorrigibility, defendant effectively posited that life without parole sentences for juveniles are totally forbidden by Article I, Section 27. This would, in effect, render any statute prescribing life without parole as a permissible punishment for juveniles unconstitutional. Having granted review of this issue,[5] we now reject defendant's

---

[5] The concurrence in the result (the concurrence) suggests this issue is not before us, pointing to the language of the proposed "issue[ ] to be briefed": "[w]hether the Court of Appeals erred by failing to consider [defendant's] challenge under Article I, [Section] 27 of the North Carolina Constitution." (Emphasis omitted; capitalization changed). It ignores, however, the actual substantive arguments made by defendant in his petition for discretionary review under this proposed issue heading. Therefore, the question of whether the Court of Appeals needed to consider a constitutional challenge under our state constitution's allegedly "broader" protections is before us. This is true notwithstanding defendant's late concession that he would not be entitled to more protections if we were to remand. This concession does not exist in a vacuum; its context clarifies its reach. Defendant filed his petition for discretionary review on 28 July 2021. Almost a year later, this Court issued *State v. Kelliher*, 381 N.C. 558, 873 S.E.2d 366 (2022). And after we allowed discretionary review on 30 August 2023, defendant's position morphed. Nevertheless, defendant does not abandon his fundamental presupposition that, as a general matter,

contention. To do so, we must consider our constitutional structure as well as the

history of our Cruel or Unusual Punishments Clause jurisprudence.

### 1. *Fundamental Principles of Constitutional Interpretation*

Because "[a] frequent recurrence to fundamental principles is absolutely

necessary to preserve the blessings of liberty," N.C. Const. art. I, § 35, we start with

fundamental principles. Since 1776, our state constitutions have recognized that all

political power fundamentally derives from the people, *id.* art. I, § 2; N.C. Const. of

1868, art. I, § 2; N.C. Const. of 1776, Declaration of Rights, § I, and that "[t]he people

of this State have the inherent, sole, and exclusive right of regulating the internal

government and police thereof," N.C. Const. art. I, § 3; N.C. Const. of 1868, art. I, § 3;

*see also* N.C. Const. of 1776, Declaration of Rights, § II. The people "ordain[ed] and

---

Article I, Section 27 may provide criminal defendants more protections than the Eighth Amendment; rather, he now states simply that on the facts of his case, "Article I, [Section] 27 *independently compels* the *same* substantive requirement provided by" federal caselaw. (Emphasis added). This concession came after *Kelliher*, where this Court unnecessarily uncoupled our application of Article I, Section 27 from the Eighth Amendment only to nevertheless determine that "there [was] no reason to depart from the basic Eighth Amendment analytical framework." *Id.* at 584, 873 S.E.2d at 385. *Kelliher* applied the same standards articulated by federal courts construing the Eighth Amendment to the state constitutional inquiry. *Id.* at 586–87, 873 S.E.2d at 387. Therefore, defendant's late statement that "the change to th[e] historical rule [of lockstepped application of the Eighth Amendment and Article I, Section 27] enunciated in *State v. Kelliher* does not apply to his case" is not a general repudiation of his stance that Article I, Section 27 generally provides more protections to criminal defendants. Rather, it is merely a concession that *Kelliher*'s rote recitation of federal standards as independently stemming from the state constitution "results in his claim being *functionally* analyzed under the North Carolina Constitution just as it would be under the United States Constitution." (Emphasis added). As we explain herein, we agree with defendant's ultimate conclusion that his claims under both constitutions are "functionally" analyzed the same. We arrive at that conclusion, however, for different reasons.

establish[ed]" this internal government in their state constitutions, N.C. Const. pmbl.; N.C. Const. of 1868, pmbl., assigning certain tasks to, and expressly limiting the powers of, the different branches of government, *Harper v. Hall*, 384 N.C. 292, 297, 886 S.E.2d 393, 398 (2023).

North Carolinians, however, did not subject themselves to one government alone. Rather, nearly thirteen years after forming their state government, they "affirmatively conferred" some of their political power upon the federal government and "surrendered some of their authority to the United States" by ratifying the United States Constitution in 1789. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 847, 115 S. Ct. 1842, 1876 (1995) (Thomas, J., dissenting). Thus, the citizens of North Carolina are subject to two foundational, governing documents: the United States Constitution and the North Carolina Constitution. This system of dual sovereignty is known as federalism.

Of those two documents, the United States Constitution is "the supreme Law of the Land[,] and the Judges in every State shall be bound thereby." U.S. Const. art. VI, cl. 2. The Federal Constitution's supremacy encompasses many of the guarantees in the Bill of Rights, including those of the Eighth Amendment, because they are equally applicable to the States. *See Robinson v. California*, 370 U.S. 660, 667, 82 S. Ct. 1417, 1420–21 (1962) (applying the Eighth Amendment's provisions to a State through the Due Process Clause of the Fourteenth Amendment).

Unlike the state constitution, which is not a grant of power but rather

limitations placed on the "power . . . [that] inheres in the people," *Harper*, 384 N.C. at 323, 886 S.E.2d at 414 (quoting *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961)), the Federal Constitution is a *limited grant* of the people's political power. The federal government may therefore exercise only those powers that the people, through the Federal Constitution, expressly confer upon it. *See, e.g., Reid v. Covert*, 354 U.S. 1, 5–6, 77 S. Ct. 1222, 1225 (1957) (plurality opinion). Accordingly, any "powers not delegated to the United States by the [Federal] Constitution, nor prohibited by it to the States," remain with the people and their state governments. U.S. Const. amend. X. The people of North Carolina control these "reserved" powers and have expressed their will for them in the state constitution. *See U.S. Term Limits*, 514 U.S. at 847–48, 115 S. Ct. at 1876 (Thomas, J., dissenting). Ultimately, this arrangement "preserves the sovereign status of the States." *Alden v. Maine*, 527 U.S. 706, 714, 119 S. Ct. 2240, 2247 (1999).

Notably, the Federal Constitution does not grant any arm of the federal government—even the Supreme Court of the United States—authority to set out the meaning of *state* law, including our state constitutional provisions. That power is thus steadfastly reserved to the people of North Carolina. In turn, the people of North Carolina placed the responsibility of interpreting state law on the judicial branch. *See* N.C. Const. art. IV; *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6–7 (1787). Therefore, only this Court, as the supreme arbiter of North Carolina law, can answer such questions with finality. *See, e.g.*, *Holmes v. Moore*, 384 N.C. 426, 437, 886 S.E.2d 120, 130

(2023); *State v. Robinson*, 375 N.C. 173, 184, 846 S.E.2d 711, 720 (2020).

Because this Court's construction of state constitutional provisions is final, we interpret the North Carolina Constitution independently of the United States Supreme Court's interpretation of the Federal Constitution. *See Holmes*, 384 N.C. at 437, 886 S.E.2d at 130. We are free to construe our own constitution as providing more, the same, or less protection than the Federal Constitution, even when the state and federal provisions are identical.[6] *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103–04 (1998). This is particularly true for state constitutional provisions that predate the ratification of the Federal Constitution or have no federal analog. Even when a state constitutional provision provides less protection than a parallel federal provision, however, we must nevertheless apply the Federal Constitution's protections because, as the supreme law of the land, "the rights *it* guarantees must be applied to every citizen by the courts of North Carolina, so no citizen will be 'accorded lesser rights' no matter how we construe the state [c]onstitution." *Id.* at 648, 503 S.E.2d at 103. Thus, even if we were to conclude that Article I, Section 27 provides less protection than the Eighth Amendment, we would nevertheless apply the federal

---

[6] The fact that this Court *may* construe the state constitution to provide less protection than the Federal Constitution does not mean that we are compelled to do so. In some cases, our constitution's text, our state's unique history, and our jurisprudence may very well dictate the same or more protections than those afforded by the Federal Constitution. We simply acknowledge that it may sometimes provide less protection and that we are not obligated to treat our state constitution "as a one-way ratchet to provide only greater rights and remedies than a parallel provision of the United States Constitution." *Iowa v. Brown*, 930 N.W.2d 840, 857 (Iowa 2019) (McDonald, J., concurring).

protections.

In our quest to determine the extent of Article I, Section 27's protections, we must apply the fundamental approach by which this Court has decided constitutional questions for over two centuries. *See Harper*, 384 N.C. at 378–79, 886 S.E.2d at 448–49; *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 211–13, 886 S.E.2d 16, 31–33 (2023); *Holmes*, 384 N.C. at 435–39, 886 S.E.2d at 129–32.

As an initial matter, we always presume that legislation is constitutional, and we require a constitutional limitation on the General Assembly to be explicit in the text and demonstrated beyond a reasonable doubt. *Harper*, 384 N.C. at 323, 886 S.E.2d at 414; *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32; *Holmes*, 384 N.C. at 435, 886 S.E.2d at 129. After all, "[t]he Legislature alone may determine the policy of the State, and its will is supreme, except where limited by constitutional inhibition." *Holmes*, 384 N.C. at 435, 886 S.E.2d at 129 (quoting *State v. Revis*, 193 N.C. 192, 195, 136 S.E. 346, 347 (1927)). "When invoked," such constitutional "exception[s] or limitation[s] . . . present[ ] a question of power for the courts to decide. But even then the courts do not undertake to say what the law ought to be; they only declare what it is." *Id.* (quoting *Revis*, 193 N.C. at 195, 136 S.E. at 347).

The rationale for this framework is grounded in the structure of the state constitution. As discussed above, the people are the repository of all political power. The people exercise their inherent political power through their elected representatives in the General Assembly. *State ex rel. Ewart v. Jones*, 116 N.C. 570,

570, 21 S.E. 787, 787 (1895). We have therefore recognized that "the General Assembly serves as 'the agent of the people for enacting laws,'" giving the legislature "the presumptive[, plenary] power to act." *Harper*, 384 N.C. at 323, 886 S.E.2d at 414 (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989)).

Moreover, Article I, Section 6 establishes that the powers of the three branches of government "shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Like other provisions of the Declaration of Rights, the Separation of Powers Clause "is to be considered as a general statement of a broad, albeit fundamental, constitutional principle." *Harper*, 384 N.C. at 321, 886 S.E.2d at 413 (quoting *State v. Furmage*, 250 N.C. 616, 627, 109 S.E.2d 563, 571 (1959)). Later, more specific portions of the constitutional text expand on this abstract principle: Article II sets forth the legislative power; Article III, the executive; and Article IV, the judicial. *See id.* at 321–22, 886 S.E.2d at 413 (citing John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 46 (2d ed. 2013) [hereinafter *State Constitution* (2d ed.)]); *see also* N.C. Const. arts. II–IV. The specific language used in Articles II, III, and IV confirms that the legislature, but not the executive or judicial branches, wields plenary power. *See Harper*, 384 N.C. at 322, 886 S.E.2d at 413 ("Nowhere was it stated that the three powers or branches had to be equal. In fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." (quoting *State Constitution* (2d ed.) 50)).

But because "[t]he people speak through the express language of their constitution, and only the people can amend it," *id.* at 297, 886 S.E.2d at 398 (citing N.C. Const. art. XIII), the General Assembly cannot exceed the express limits placed on it by the constitutional text, *id.* at 323, 886 S.E.2d at 414; *see also id.* at 297, 886 S.E.2d at 398 ("[T]he state constitution is *a limitation on power*." (emphasis added)). When a legislative act goes beyond these limits, the judiciary *must* use its "constitutional power of judicial review" to strike it down. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 650, 781 S.E.2d 248, 259 (2016) (Newby, J., concurring in part and dissenting in part); *see also Bayard*, 1 N.C. (Mart.) at 7 ("[N]o act [of the General Assembly] . . . could by any means repeal or alter the [c]onstitution."); *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32 ("[W]hen a challenger proves the unconstitutionality of a law beyond a reasonable doubt, this Court will not hesitate to pronounce the law unconstitutional and to vindicate whatever constitutional rights have been infringed.").

Still, we must use the power of judicial review with "great reluctance," *Bayard*, 1 N.C. (Mart.) at 6, resisting any temptation to intrude into the legislature's policy-making role, *see Holmes*, 384 N.C. at 439, 886 S.E.2d at 132 ("The power to invalidate legislative acts is one that must be exercised by this Court with the utmost restraint . . . ."). Our constitution makes plain that "a restriction on the General Assembly is in fact a restriction on the people." *Berger*, 368 N.C. at 651, 781 S.E.2d at 259 (Newby, J., concurring in part and dissenting in part); *see also Cmty. Success*,

384 N.C. at 211, 886 S.E.2d at 31 (stating that acts of the General Assembly are "expressions of the people's will"). Thus, when the judiciary strikes down a duly enacted law of the General Assembly, it creates tension not only between the judicial and legislative branches but also between the judiciary and the people.

The presumption of constitutionality eases this tension. It is "a critical safeguard that preserves the delicate balance between this Court's role as the interpreter of our [c]onstitution and the legislature's role as the voice through which the people exercise their ultimate power." *Holmes*, 384 N.C. at 435, 886 S.E.2d at 129; *see also Harper*, 384 N.C. at 299, 886 S.E.2d at 399 ("[T]he people act and decide policy matters through their representatives in the General Assembly. We are designed to be a government of the people, not of the judges."); *Cmty. Success*, 384 N.C. at 211, 886 S.E.2d at 32 (stating that this Court does not strike down the General Assembly's acts "unless [they] violate[ ] federal law or *the supreme expression of the people's will, the North Carolina Constitution*" (emphasis added)). It is the challenger's burden to overcome this presumption of validity. *Cmty. Success*, 384 N.C. at 212, 886 S.E.2d at 32.

These standards are well-settled. *See Harper*, 384 N.C. at 378–79, 886 S.E.2d at 448–49. From the beginning, North Carolina's courts have exercised judicial review with the utmost caution, only declaring a law unconstitutional if it violated the express constitutional text. *See Bayard*, 1 N.C. (Mart.) at 6–7; *see also Cooper v. Berger*, 371 N.C. 799, 811, 822 S.E.2d 286, 296 (2018) ("Unless the [c]onstitution

expressly or by necessary implication restricts the actions of the legislative branch, the General Assembly is free to implement legislation as long as that legislation does not offend some specific constitutional provision." (emphases omitted) (quoting *Baker v. Martin*, 330 N.C. 331, 338–39, 410 S.E.2d 887, 891–92 (1991))). The same is true of our requirement that the challenging party demonstrate unconstitutionality beyond a reasonable doubt, an evidentiary standard that goes back centuries. *See, e.g.*, *State ex rel. Lee v. Dunn,* 73 N.C. 595, 601 (1875) ("[I]t is for the appellant to show that the [l]egislature is restricted by the express provisions of the [c]onstitution, or by necessary implication therefrom. And this he must show beyond a reasonable doubt." (citations omitted) (first citing *State v. Adair*, 66 N.C. 298, 303 (1872); and then citing *King v. W. & W. R.R. Co.*, 66 N.C. 277, 283 (1872))); *Daniels v. Homer*, 139 N.C. 219, 227–28, 51 S.E. 992, 995 (1905) ("A statute will never be held unconstitutional if there is any reasonable doubt." (quoting *State v. Lytle*, 138 N.C. 738, 741, 51 S.E. 66, 68 (1905))). This requirement serves as "a necessary protection against abuse of [the judicial review] power by unprincipled or undisciplined judges." *Holmes*, 384 N.C. at 439, 886 S.E.2d at 132.

Having outlined our presumption of constitutionality, we now explain the methodology by which we evaluate a constitutional challenge. Every constitutional inquiry examines the text of the relevant provision, the historical context in which the people of North Carolina enacted it, and this Court's precedents interpreting it.

*Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33*; Berger*, 368 N.C. at 639, 781 S.E.2d at 252; *see Harper*, 384 N.C. at 323–70, 886 S.E.2d at 414–43.

We begin with the text of the applicable provision. *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33 ("[W]here the meaning is clear from the words used, we will not search for a meaning elsewhere." (alteration in original) (quoting *Preston*, 325 N.C. at 449, 385 S.E.2d at 479)). "The constitution is interpreted based on its plain language. The people used that plain language to express their intended meaning of the text when they adopted it." *Harper*, 384 N.C. at 297, 886 S.E.2d at 399. Because "[w]e[ ] the people" enshrined the constitution's protections, N.C. Const. pmbl.; *see also id.* art. I, §§ 2–3, "[t]here are no hidden meanings or opaque understandings—the kind that can only be found by the most astute justice or academic." *Harper*, 384 N.C. at 297, 886 S.E.2d at 399. Axiomatically, "[t]he constitution was written to be understood by everyone, not just a select few." *Id.*

We then study the historical background against which the people enacted the constitutional text. *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33; *see also Harper*, 384 N.C. at 351, 886 S.E.2d at 431. Our goal here is "to isolate the provision's meaning at the time of its ratification." *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33; *see Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 613, 264 S.E.2d 106, 110 (1980) ("Inquiry must be had into the history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation."). "We also seek guidance from any on-point

precedents from this Court interpreting the provision." *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33 (citing *Elliott v. State Bd. of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 921 (1932)).

Guided by these state constitutional principles, our sole goal in construing Article I, Section 27 is to "consistently reflect what the people agreed the text meant *when they adopted it*." *Harper*, 384 N.C. at 297, 886 S.E.2d at 399 (emphasis added). We now turn to the provision at issue in this case. Understanding that criminal sentencing, particularly of juveniles, is a subject susceptible to differing viewpoints, we emphasize that we the Justices must leave our personal feelings, and perceptions of popular opinion, to the side.[7] Furthermore, in construing the text, "[i]t is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself." *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997).

## 2. *The Cruel or Unusual Punishments Clause's Text*

In Article I, Section 27, the people of North Carolina declared, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments

---

[7] *See State v. Woodson*, 287 N.C. 578, 597, 215 S.E.2d 607, 619 (1975) (Exum, J., concurring) ("[F]or me, the question of the constitutionality of imposing a sentence of death for conviction of first[-]degree murder duly authorized by legislative enactment is for the first time squarely presented. It is not an easy question for I am personally opposed to capital punishment. Maintaining it, even for murder, is not in my view wise public policy. I do not believe, however, that its infliction upon one convicted of premeditated murder or murder committed in the course of another felony which itself is inherently dangerous to human life . . . contravenes the Constitution of . . . North Carolina.").

inflicted." N.C. Const. art. I, § 27. The Cruel or Unusual Punishments Clause predates the Federal Constitution, first appearing in North Carolina's 1776 constitution. N.C. Const. of 1776, Declaration of Rights, § X. The clause has appeared in every subsequent version of our state constitution with little alteration to the text. *Compare* N.C. Const. art. I, § 27 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."), *with* N.C. Const. of 1868, amends. of 1875, art. I, § 14 ("Excessive bail should not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."), *and* N.C. Const. of 1868, art. I, § 14 (same), *and* N.C. Const. of 1776, amends. of 1835, Declaration of Rights, § 10 ("That excessive bail should not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted."), *and* N.C. Const. of 1776, Declaration of Rights, § X (same).

As a textual matter, the Cruel or Unusual Punishments Clause generally forbids the infliction of "cruel" punishments and "unusual" punishments. N.C. Const. art. I, § 27. The text of this provision does not expressly set out, however, what it means for a punishment to be "cruel or unusual." *See, e.g.*, *State v. Driver*, 78 N.C. 423, 429 (1878); *State v. Griffin*, 190 N.C. 133, 136–37, 129 S.E. 410, 412 (1925); *cf. Trop v. Dulles*, 356 U.S. 86, 100 & n.32, 78 S. Ct. 590, 598 & n.32 (1958) ("[T]he words of the [Eighth] Amendment are not precise . . . . Whether the word 'unusual' has any qualitative meaning different from 'cruel' is not clear."). Simple reference to the use of the disjunctive "or" does not clarify this obscurity. Indeed, a survey of over one

hundred Cruel or Unusual Punishments Clause cases suggests that this Court historically did not treat the use of the disjunctive in our Declaration of Rights as significant or dispositive in the inquiry. Therefore, to fully understand the meaning the people intended, we must turn to the history of the Cruel or Unusual Punishments Clause, our precedents, and other pertinent provisions of the state constitution.

### 3. *History of the Cruel or Unusual Punishments Clause*

With respect to the history of the Cruel or Unusual Punishments Clause, its original intent was to protect against abuses of judicial power in the form of illegal and arbitrary sentencing practices. The clause finds its genesis in the English Bill of Rights of 1689, *e.g., Driver*, 78 N.C. at 424; *see also Griffin*, 190 N.C. at 136, 129 S.E. at 412; *Harper*, 384 N.C. at 360–61, 361 n.22, 886 S.E.2d at 437 & n.22; John V. Orth, *The North Carolina State Constitution* 5, 70 (1993) [hereinafter *State Constitution*], which stated "[t]hat . . . cruell and unusuall Punishments [ought not to be] inflicted," Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.). The English Parliament made this declaration in response to "unprecedented proceedings in the court of [K]ing's [B]ench in the reign of [K]ing James the Second." 4 William Blackstone, *Commentaries* \*378 [hereinafter *Commentaries*]. *See generally* Bill of Rights 1689, 1 W. & M. Sess. 2 c. 2 (Eng.) ("King James the Second[,] by the Assistance of diverse evill Councellors[,] Judges[,] and Ministers imployed by him[,] did endeavor to subvert and extirpate . . . the Lawes and Liberties of th[at] Kingdome . . . [b]y . . . [inflicting] illegall and cruell

Punishments . . . ."). Specifically, historical evidence suggests that this prohibition was largely targeted at the King's Bench's exercise of "arbitrary sentencing power," including accusations that Lord Chief Justice Jefferys of the King's Bench illegally " 'invent[ed]' special penalties for the King's enemies . . . that were not authorized by common-law precedent or statute." *Harmelin v. Michigan*, 501 U.S. 957, 968, 111 S. Ct. 2680, 2688 (1991) (opinion of Scalia, J., with Rehnquist, C.J.); *see also id.* at 966–75, 111 S. Ct. at 2686–91 (recounting the history of the Eighth Amendment's Cruel and Unusual Punishments Clause).

Early English cases applying the English Bill of Rights's proscription confirm this scope. They were concerned with judges who had ignored "the bounds and limits which the law ha[d] set them," thereby making punishment "depend[ent] upon the judge's pleasure." *Driver*, 78 N.C. at 428–29 (quoting *Lord Devonshire's Case*, 11 How. St. Tr. 1354, 1357, 1361, 1372 (1689) (Eng.)). In other words, the English Bill of Rights aimed to limit judicial discretion in sentencing by limiting permissible punishments to those enacted by statute or derived from the common law. *See Harmelin*, 501 U.S. at 973, 111 S. Ct. at 2690 (opinion of Scalia, J., with Rehnquist, C.J.) ("In all these contemporaneous discussions, as in the prologue of the [English Bill of Rights,] a punishment is . . . considered objectionable . . . because it is 'out of [the Judges'] Power,' 'contrary to Law and ancient practice,' without 'Precedents' or 'express Law

to warrant,' 'unusual,' 'illegal,' and imposed by 'Pretence to a discretionary Power.' "

(second alteration in original)).[8]

Because the Cruell and Unusuall Punishments Clause's protections were "thought to be so appropriate," our framers enshrined the Cruel or Unusual Punishments Clause into our Declaration of Rights even though "there never ha[d] been anything in our government, [s]tate or [n]ational, to provoke such a provision." *Driver*, 78 N.C. at 427. And because the people adopted "all . . . such parts of the [English] common law" not "inconsistent with the freedom and independence" of North Carolina nor otherwise "abrogated, repealed, or . . . obsolete," 1 Potter's Revisal

---

[8] This understanding comports with Sir William Blackstone's articulation of the role of judges in criminal sentencing. Blackstone observed that "court[s] must pronounce that judgment, *which the law has annexed to the crime, and which hath been constantly mentioned.*" *Commentaries* at *376 (emphasis added). He observed that "one of the glories of . . . English law [was] that the species, though not always the quantity or degree, of punishment [was] *ascertained* for every offense; and that it [was] not left in the breast of any judge, . . . to alter that judgment, which the law ha[d] beforehand ordained." *Id.* at *377. Blackstone remarked that this feature "prevent[ed] oppression" while also "stifl[ing] hopes of impunity or mitigation" based on the "humor or discretion of the court." *Id.* at *377–78. According to Blackstone, the beauty of the English legal system was that "where an *established* penalty [was] annexed to crimes, the criminal [could] read their *certain* consequence in that law, which ought to be the *unvaried* rule, as it is the *inflexible* judge, of his actions." *Id.* at *378 (emphases added). Blackstone acknowledged that "discretionary fines and discretionary lengths of imprisonment which . . . courts are enabled to impose may seem an exception to this rule." *Id.* Blackstone assured his readers, however, that "the general nature of the punishment . . . [was] . . . fixed and determinate," and that "however unlimited the power of the court [to determine the quantum of the fine or punishment] may [have] seem[ed], it [was] far from being wholly arbitrary" because "[*the court's*] *discretion* [*was*] *regulated by law.*" *Id.* (emphasis added). Blackstone then specifically highlighted the English Bill of Rights's Cruell and Unusuall Punishments Clause as an outer limit on the judges' discretionary sentencing power. *See id.* ("For the bill of rights has particularly declared that excessive fines ought not to be imposed, nor cruel and unusual punishment inflicted . . . .").

of 1821, 1778, ch. 133, § 2,[9] the English understanding of the Cruell and Unusuall Punishments Clause is instrumental to our understanding of the Cruel or Unusual Punishments Clause, *see, e.g.*, *Driver*, 78 N.C. at 427–30. Indeed, our earliest cases applying the state constitution's Cruel or Unusual Punishments Clause also understood it to be principally directed at the judiciary and only in cases in which the judge "ha[d] a discretion over the amount of bail, the quantum of the fine, and the nature of the punishment." *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144, 162 (1838)[10]; *State v. Blake*, 157 N.C. 608, 611, 72 S.E. 1080, 1081–82 (1911); *State v. Smith*, 174 N.C. 804, 805, 93 S.E. 910, 911 (1917); *State Constitution* 70.

Similar to the English's understanding of their Bill of Rights's proscription of "cruell and unusuall punishments," this Court understood the state constitutional proscription of cruel or unusual punishments to forbid judges from imposing sentences "not sanctioned by common law or statute." *Harmelin*, 501 U.S. at 984 n.10, 111 S. Ct. at 2696 n.10 (opinion of Scalia, J., with Rehnquist, C.J.) (first citing *Driver*, 78 N.C. at 425–27; and then citing *Blake*, 157 N.C. at 611, 72 S.E. at 1081–82). In

---

[9] The English common law had been declared in force by North Carolina's colonial government. 1 Potter's Revisal of 1821, 1715, ch. 5, § 2. This declaration remains a part of our law, being codified, with amendments, in our current General Statutes. N.C.G.S. § 4-1 (2023).

[10] We acknowledge that the law at issue in *Manuel* was deplorable and should have been held unconstitutional because, as the defendant argued, it was "arbitrary, repugnant to the principles of free government," and "not of the character properly embraced within the term 'law of the land.'" 20 N.C. (3 & 4 Dev. & Bat.) at 163. *Manuel* is this Court's only case discussing the scope of the Cruel or Unusual Punishments Clause under the 1776 Constitution, however, and we cite it only to understand the Clause's historical meaning and scope.

other words, the Cruel or Unusual Punishments Clause required judges to temper their sentencing discretion *by law*, conforming their judgments to the punishments authorized by statute or permitted at common law. *See Driver*, 78 N.C. at 428. Noting that if judges adhered to "what has formerly been expressly done in like cases"—or "for the want of such particular discretion," if they sentenced by "consider[ing] that which comes nearest to it"—this Court stated "the punishment will be such as is 'usual,' and therefore not 'excessive' or 'cruel.' " *Id.* at 430 (quoting *Lord Devonshire's Case*, 11 How. St. Tr. at 1362).

These early cases did not treat the Cruel or Unusual Punishments Clause as completely inapplicable to the other branches of government; rather, they recognized that the proscription had *some* applicability to the legislative branch. *See Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) at 162 ("No doubt the principles of humanity sanctioned and enjoined in this section [(i.e., Article I, Section 27's predecessor)] ought to command the reverence and regulate the conduct of *all* who owe obedience to the constitution."); *State Constitution* 70. Nevertheless, given the legislature's prerogative to prescribe criminal punishment, *Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) at 159, this Court acknowledged it would be hard-pressed to ever declare that an act of the General Assembly imposed a punishment violative of Article I, Section 27's general proscription, *id.* at 162. This Court stated that it could do so only when "the act complained of . . . contains such a flagrant violation of all discretion as to show a disregard of constitutional restraints." *Id.*

Thus, the original meaning of the Article I, Section 27 was principally to place outer limits on judges' sentencing discretion. The Cruel or Unusual Punishments Clause prohibited judges from imposing sentences that disregarded the parameters imposed by statutes or the common law. So long as a punishment comported with the boundaries imposed by law, it was not cruel or unusual in a constitutional sense.[11]

_____

[11] This understanding was the hallmark of our Cruel or Unusual Punishments Clause jurisprudence from the founding era and throughout the latter half of the twentieth century. *E.g.*, *State v. Wall*, 304 N.C. 609, 616, 286 S.E.2d 68, 73 (1982); *State v. Squire*, 302 N.C. 112, 121, 273 S.E.2d 688, 694 (1981); *State v. Handsome*, 300 N.C. 313, 317, 266 S.E.2d 670, 674 (1980); *State v. Atkinson*, 298 N.C. 673, 685–86, 259 S.E.2d 858, 865–66 (1979); *State v. Pearce*, 296 N.C. 281, 295, 250 S.E.2d 640, 649–50 (1979); *State v. Fulcher*, 294 N.C. 503, 525, 243 S.E.2d 338, 352 (1978); *State v. Watson*, 294 N.C. 159, 171, 240 S.E.2d 440, 448 (1978); *State v. Jenkins*, 292 N.C. 179, 190–91, 232 S.E.2d 648, 655 (1977); *State v. Barrow*, 292 N.C. 227, 234, 232 S.E.2d 693, 697–98 (1977); *State v. Legette*, 292 N.C. 44, 57–58, 231 S.E.2d 896, 904 (1977); *State v. Sweezy*, 291 N.C. 366, 384–86, 230 S.E.2d 524, 536 (1976); *State v. Slade*, 291 N.C. 275, 283–84, 229 S.E.2d 921, 927 (1976); *State v. Tolley*, 290 N.C. 349, 362, 226 S.E.2d 353, 364 (1976); *State v. Foster*, 284 N.C. 259, 266–67, 200 S.E.2d 782, 788–89 (1973); *State v. Frank*, 284 N.C. 137, 147–48, 200 S.E.2d 169, 176–77 (1973); *State v. Cameron*, 284 N.C. 165, 172–74, 200 S.E.2d 186, 191–92 (1973); *State v. Mitchell*, 283 N.C. 462, 470–72, 196 S.E.2d 736, 741–42 (1973); *State v. Edwards*, 282 N.C. 578, 580, 193 S.E.2d 736, 737–38 (1973) (per curiam); *State v. Cradle*, 281 N.C. 198, 209, 188 S.E.2d 296, 303 (1972); *State v. Williams*, 279 N.C. 515, 521, 184 S.E.2d 282, 286 (1971); *State v. Westbrook*, 279 N.C. 18, 29–30, 181 S.E.2d 572, 578–79 (1971), *vacated on other grounds*, 408 U.S. 939, 92 S. Ct. 2873 (1972) (mem.); *State v. Atkinson*, 278 N.C. 168, 178, 179 S.E.2d 410, 417 (1971), *rev'd on other grounds*, 403 U.S. 948, 91 S. Ct. 2292 (1971) (mem.); *State v. Harris*, 277 N.C. 435, 438–39, 177 S.E.2d 865, 868 (1970); *State v. Benton*, 276 N.C. 641, 659, 174 S.E.2d 793, 805 (1970); *State v. Parrish*, 273 N.C. 477, 479, 160 S.E.2d 153, 154 (1968) (per curiam); *State v. Shoemaker*, 273 N.C. 475, 477, 160 S.E.2d 281, 282 (1968) (per curiam); *State v. Weston*, 273 N.C. 275, 284, 159 S.E.2d 883, 888 (1968); *State v. McCall*, 273 N.C. 135, 136, 159 S.E.2d 316, 316 (1968) (per curiam); *State v. Bethea*, 272 N.C. 521, 522, 158 S.E.2d 591, 592 (1968) (per curiam); *State v. Wright*, 272 N.C. 264, 266–67, 158 S.E.2d 50, 51–52 (1967) (per curiam); *State v. Pardon*, 272 N.C. 72, 74, 157 S.E.2d 698, 700 (1967); *State v. Witherspoon*, 271 N.C. 714, 715, 157 S.E.2d 362, 363 (1967) (per curiam); *State v. Yoes*, 271 N.C. 616, 631, 157 S.E.2d 386, 398 (1967); *State v. Lovelace*, 271 N.C. 593, 594, 157 S.E.2d 81, 81–82 (1967) (per curiam); *State v. Robinson*, 271 N.C. 448, 449–50, 156 S.E.2d 854, 855 (1967); *State v. Hopper*, 271 N.C. 464, 464–65, 156 S.E.2d 857, 857–58 (1967) (per curiam); *State v. Hilton*, 271 N.C. 456, 457–58, 156 S.E.2d 833, 834–35 (1967) (per curiam); *State v. LePard*, 270 N.C. 157, 158, 153 S.E.2d 875, 876 (1967) (per curiam); *State v. Greer*, 270 N.C. 143, 146, 153 S.E.2d 849,

851 (1967) (per curiam); *State v. Carter*, 269 N.C. 697, 699, 153 S.E.2d 388, 389 (1967) (per curiam); *State v. Elliot*, 269 N.C. 683, 686, 153 S.E.2d 330, 332 (1967) (per curiam); *N.C. State Bar v. Frazier*, 269 N.C. 625, 634–35, 153 S.E.2d 367, 373–74 (1967); *State v. Caldwell*, 269 N.C. 521, 527, 153 S.E.2d 34, 38 (1967); *State v. Taborn*, 268 N.C. 445, 447, 150 S.E.2d 779, 780–81 (1966) (per curiam); *State v. Newell*, 268 N.C. 300, 301, 150 S.E.2d 405, 406 (1966) (per curiam); *State v. Bruce*, 268 N.C. 174, 184–86, 150 S.E.2d 216, 224–25 (1966); *State v. Davis*, 267 N.C. 126, 128, 147 S.E.2d 570, 572 (1966) (per curiam); *State v. Hunt*, 265 N.C. 714, 716, 144 S.E.2d 890, 891 (1965) (per curiam); *State v. Slade*, 264 N.C. 70, 72–73, 140 S.E.2d 723, 725 (1965) (per curiam); *State v. Whaley*, 263 N.C. 824, 824, 140 S.E.2d 305, 305 (1965) (per curiam); *State v. Driver*, 262 N.C. 92, 92–93, 136 S.E.2d 208, 209 (1964) (per curiam); *State v. Wright*, 261 N.C. 356, 357–58, 134 S.E.2d 624, 625 (1964); *State v. Blackmon*, 260 N.C. 352, 357, 132 S.E.2d 880, 884 (1963); *Blackmon*, 260 N.C. at 357–59, 132 S.E.2d at 884–86 (Parker, J., dissenting); *State v. Brooks*, 260 N.C. 186, 190, 132 S.E.2d 354, 357 (1963); *State v. Downey*, 253 N.C. 348, 354–55, 117 S.E.2d 39, 44 (1960); *State v. Lee*, 247 N.C. 230, 230–31, 100 S.E.2d 372, 373 (1957); *State v. Smith*, 238 N.C. 82, 88, 76 S.E.2d 363, 367 (1953); *State v. Welch*, 232 N.C. 77, 82–83, 59 S.E.2d 199, 204 (1950); *State v. Stansbury*, 230 N.C. 589, 590–91, 55 S.E.2d 185, 187 (1949); *State v. White*, 230 N.C. 513, 514, 53 S.E.2d 436, 436–37 (1949); *State v. Crandall*, 225 N.C. 148, 150, 33 S.E.2d 861, 862 (1945); *State v. Richardson*, 221 N.C. 209, 210–11, 19 S.E.2d 863, 863–64 (1942), *overruled on other grounds by Blackmon*, 260 N.C. 352, 132 S.E.2d 880; *State v. Levy*, 220 N.C. 812, 815, 18 S.E.2d 355, 358 (1942); *State v. Parker*, 220 N.C. 416, 419, 17 S.E.2d 475, 477 (1941); *State v. Calcutt*, 219 N.C. 545, 548, 15 S.E.2d 9, 11 (1941); *Calcutt*, 219 N.C. at 560, 564–66, 15 S.E.2d at 20, 23–24 (Clarkson, J., concurring in part and dissenting in part); *State v. Wilson*, 218 N.C. 769, 774, 12 S.E.2d 654, 657 (1941); *State v. Brackett*, 218 N.C. 369, 373, 11 S.E.2d 146, 148–49 (1940); *State v. Moschoures*, 214 N.C. 321, 322, 199 S.E. 92, 93 (1938) (per curiam); *State v. Cain*, 209 N.C. 275, 276, 183 S.E. 300, 300–01 (1936), *overruled on other grounds by Blackmon*, 260 N.C. 352, 132 S.E.2d 880; *State v. Fleming*, 202 N.C. 512, 514, 163 S.E 453, 454 (1932); *State v. Daniels*, 197 N.C. 285, 286, 148 S.E. 244, 244 (1929) (per curiam); *Griffin*, 190 N.C. at 136–38, 129 S.E. at 412–13; *State v. Malpass*, 189 N.C. 349, 353–54, 127 S.E. 248, 251 (1925); *State v. Swindell*, 189 N.C. 151, 151–55, 126 S.E. 417, 417–19 (1925), *overruled on other grounds by Blackmon*, 260 N.C. 352, 132 S.E.2d 880; *State v. Beavers*, 188 N.C. 595, 596–97, 125 S.E. 258, 259 (1924); *State v. Mangum*, 187 N.C. 477, 480–81, 121 S.E. 765, 766–67 (1924); *State v. Spencer*, 185 N.C. 765, 767, 117 S.E. 803, 803 (1923); *State v. Jones*, 181 N.C. 543, 544–45, 106 S.E. 827, 828 (1921); *State v. Stokes*, 181 N.C. 539, 542, 106 S.E. 763, 764 (1921); *Smith*, 174 N.C. at 805–07, 93 S.E. at 911–12; *State v. Woodlief*, 172 N.C. 885, 888–91, 90 S.E. 137, 139–40 (1916); *State v. Knotts*, 168 N.C. 173, 190–91, 83 S.E. 972, 980 (1914); *State v. Shaft*, 166 N.C. 407, 410, 81 S.E. 932, 933 (1914); *State v. Lee*, 166 N.C. 250, 256–57, 80 S.E. 977, 979 (1914); *Blake*, 157 N.C. at 611, 72 S.E. at 1081–82; *In re Watson*, 157 N.C. 340, 350–52, 72 S.E. 1049, 1052–53 (1911); *Garrison v. S. Ry. Co.*, 150 N.C. 575, 593–94, 64 S.E. 578, 585–86 (1909); *State v. Lance*, 149 N.C. 551, 556–57, 63 S.E. 198, 201 (1908); *State v. Dowdy*, 145 N.C. 432, 439, 58 S.E. 1002, 1005 (1907); *State v. Farrington*, 141 N.C. 844, 845, 53 S.E. 954, 954–55 (1906); *State v. Capps*, 134 N.C. 622, 632, 46 S.E. 730, 733 (1904); *State v. Hamby*, 126 N.C. 1066, 1067, 35 S.E. 614, 614 (1900); *State v. Apple*, 121 N.C. 584, 585–86, 28 S.E. 469, 470 (1897); *State v. Haynie*, 118 N.C. 1265, 1269–70, 24 S.E.

And although this Court recognized that Article I, Section 27 (and its predecessors) placed some theoretical strictures on the General Assembly's ability to prescribe punishments, it understood that it could only strike down legislation as inflicting cruel or unusual punishments in "extraordinary and exceptional instances." *Smith*, 174 N.C. at 805, 93 S.E. at 911.[12]

### 4. Article XI

As with other " '[b]asic principles' contained within the Declaration of Rights," the Cruel or Unusual Punishments Clause must be considered "in the context of later articles that give [it] more specific application." *Harper*, 384 N.C. at 352, 886 S.E.2d at 432 (first alteration in original) (quoting *State Constitution* (2d ed.) 46).

Relevantly, when the people ratified their second constitution in 1868, they established Article XI, which concerned "*Punishments, Penal Institutions*[,] and Public Charities." N.C. Const. of 1868, art. XI (emphases added).[13] Enacted in 1971,

---

536, 536 (1896); *State v. Reid*, 106 N.C. 714, 716–17, 11 S.E. 315, 316 (1890); *State v. Miller*, 94 N.C. 904, 906–08 (1886); *State v. Miller*, 94 N.C. 902, 903–04 (1886); *State v. Pettie*, 80 N.C. 367, 369–70 (1879); *State v. Cannady*, 78 N.C. 539, 543–44 (1878); *Driver*, 78 N.C. at 424–30; *Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) at 161–63.

[12] To the extent the Cruel or Unusual Punishments Clause operated to altogether forbid certain modes of punishments that were torturous and barbaric, *see Driver*, 78 N.C. at 427–28 ("Nor was [Article I, Section 27's predecessor] intended to warn against merely erratic modes of punishment or torture, but applied expressly to 'bail,' 'fines,' and 'punishments.' "), imprisoning a criminal defendant would not fall under any such prohibition. Moreover, as discussed below, other unique provisions of our state constitution subsequently put the question of which punishments are allowed under the Cruel or Unusual Punishments Clause beyond dispute.

[13] Prior to 1868, the state constitution did not provide specific application to Article I, Section 27's general proscription of cruel or unusual punishments, save perhaps the provision forbidding ex post facto laws, N.C. Const. of 1776, Declaration of Rights, § XXIV, and the

the current state constitution retains Article XI with the heading *"Punishments,*

*Corrections,* and Charities." N.C. Const. art. XI (emphases added). Applicable to all

three branches of government, this article contains two relevant sections that define

the outer limits of allowable punishments—in other words, punishments that cannot

be considered cruel or unusual.

In Article XI, Section 1, which is entitled "Punishments," the people

enumerated an exhaustive list of the types of punishments that may be

constitutionally inflicted. In the current constitution, that section states:

> The following punishments only shall be known to
> the laws of this State: *death*, *imprisonment*, fines,
> suspension of a jail or prison term with or without
> conditions, restitution, community service, restraints on
> liberty, work programs, removal from office, and
> disqualification to hold and enjoy any office of honor, trust,
> or profit under this State.

N.C. Const. art. XI, § 1 (emphases added). By enumerating an exhaustive list of

constitutionally allowable punishments, "[t]his provision . . . was intended to stop the

use of degrading punishments theretofore inflicted." *Shore v. Edmisten*, 290 N.C. 628,

631, 227 S.E.2d 553, 557 (1976) (citing Albert Coates, *Punishment for Crime in North

Carolina*, 17 N.C. L. Rev. 205 (1939)). "[A]s a necessary consequence it also limited

---

provision forbidding imprisonment for debt "where there is not a strong Presumption of
Fraud," N.C. Const. of 1776, § XXXIX. These provisions were carried over into the second
constitution, N.C. Const. of 1868, art. I, §§ 16, 32, along with a few new relevant provisions,
including a provision forbidding the payment of "costs, jail fees, or necessary witness fees for
the defense, unless found guilty," *id.* § 11; a provision outlawing involuntary servitude unless
"for crime whereof the parties shall have been duly convicted," *id.* § 33; and, most
importantly, Article XI.

the creativity of trial judges in fashioning remedies for crime." *Id.* Therefore, "criminal convictions can result only in the punishments listed in [Article XI, Section 1]." *State Constitution* 157.

The people were even more specific about the availability of the death penalty. In Article XI, Section 2, entitled "Death punishment," the people limited the death penalty to certain crimes. N.C. Const. art. XI, § 2. Recognizing the need to balance justice and mercy, the people limited the use of the death penalty to cases of "murder, arson, burglary, and rape, and these only, . . . *if the General Assembly shall so enact.*" *Id.* (emphasis added).

Because a constitution cannot violate itself, we must construe Article I, Section 27's proscription of cruel or unusual punishments and Article XI's enumeration of acceptable punishments harmoniously. Logically, therefore, the punishments the people sanctioned in Article XI, Sections 1 and 2 are inherently not "cruel or unusual" in a constitutional sense. *E.g.*, *State v. Jarrette*, 284 N.C. 625, 655–56, 202 S.E.2d 721, 740–41 (1974), *vacated on other grounds by* 428 U.S. 903, 96 S. Ct. 3205 (1976) (mem.); *Westbrook*, 279 N.C. at 30, 181 S.E.2d at 579; *Yoes*, 271 N.C. at 631, 157 S.E.2d at 398; *Revis*, 193 N.C. at 197, 126 S.E. at 349 ("There are those who question the wisdom, and even the right, of the State to take life, or to inflict the death penalty, as a punishment for crime, but, in the face of [Article XI, Section 1,] . . . none can deny the power of the Legislature to prescribe the death penalty."); *see also, e.g.*, *State v. Atkinson*, 275 N.C. 288, 319, 167 S.E.2d 241, 260 (1969), *rev'd on other grounds*, 403

U.S. 948, 91 S. Ct. 2283 (1971) (mem.); *State Constitution* 157. Accordingly, an act of

the General Assembly cannot violate the Cruel or Unusual Punishments Clause by

prescribing a punishment allowable under Article XI, Sections 1 and 2, and similarly,

judges cannot violate Article I, Section 27, by handing down a sentence in obedience

to such an act. *See, e.g.*, *State v. Allen*, 346 N.C. 731, 737, 488 S.E.2d 188, 191 (1997);

*Stansbury*, 230 N.C. at 591, 55 S.E.2d at 187; *see also Atkinson*, 278 N.C. at 178, 179

S.E.2d at 417; *Bruce*, 268 N.C. at 185, 150 S.E.2d at 225 (quoting *State v. McNally*,

211 A.2d 162, 164 (Conn. 1965)).[14]

---

[14] The concurrence posits that this traditional understanding "effectively writes [Article I, Section 27] out of the [c]onstitution." It insists that while Article XI "describes what is permissible in *kind*," Article I, Section 27 is tasked with describing what is "proportional or reasonable in degree." In the concurrence's view, judges may freely interject themselves to strike down legislatively prescribed punishments that otherwise comport with Article XI when they feel such punishments are "unreasonable and disproportionate." This understanding would be surprising to the generations of Justices that have come before us. Indeed, the steadfast position of this Court was that the Cruel or Unusual Punishments Clause was predominantly intended to ensure that judges only inflicted the punishments prescribed by the law, recognizing the legislature's prerogative to set criminal sentencing policy could be interfered with only in truly extraordinary and exceptional circumstances. *See* footnote 11 and accompanying text. And since the ratification of Article XI, this Court has not authorized judges to impose their will on criminal sentencing policy by unilaterally declaring that duly enacted sentences go too far. The cases cited by the concurrence do not compel a different result. They are either (a) taken out of context, *e.g.*, *Griffin*, 190 N.C. at 137, 129 S.E. at 412; *Woodlief*, 172 N.C. at 891, 90 S.E. at 140; *State v. Burnett*, 179 N.C. 735, 741, 102 S.E. 711, 714 (1920); (b) federal cases that are inapplicable to the meaning of Article I, Section 27, *Robinson*, 370 U.S. at 667, 82 S. Ct. at 1420–21; (c) cases discussing *federal* standards, *State v. Green*, 348 N.C. 588, 603, 502 S.E.2d 819, 828 (1998); (d) obiter dictum that was subsequently refuted by this Court, *compare Lee*, 166 N.C. at 256–57, 80 S.E. at 979 (dictum) ("As we have given a new trial for the errors above stated, we will not now discuss or consider [whether the sentence was cruel or unusual], as to which it is unnecessary that we intimate any opinion."), *with, e.g.*, *Wright*, 261 N.C. at 358, 134 S.E.2d at 625 ("If the sentence is disproportionately long, the Governor and the Board of Paroles have ample authority to make adjustment. This Court, *lacking such authority*, must affirm the judgment." (emphasis added)); or (e) cases interpreting different constitutional provisions altogether, *State ex rel. Bryan v. Patrick*, 124 N.C. 651, 661–62, 33 S.E. 151, 153 (1899)

Notably, when the people desired to limit the State's ability to inflict punishments, they created and amended the working article of the constitution—Article XI—not the general provision in the Declaration of Rights. *See Shore*, 290 N.C. at 631, 227 S.E.2d at 557. It is therefore unsurprising that unlike the text of the Cruel or Unusual Punishments Clause, which has remained largely unaltered since 1776, the text of Article XI, describing approved punishments, has been altered several times over the years to reflect *the people's* changing understanding of crime and punishment.

For example, the 1868 Constitution included a lengthier and more detailed predecessor to the current Article XI. The original text reflected how North Carolinians of 1868 understood punishment, allowing, for example, "imprisonment, with or without hard labor." N.C. Const. of 1868, art. XI, § 1. In 1875, an amendment further defined the parameters of "imprisonment with hard labor" to authorize only certain types of labor, to exclude from that punishment those with certain underlying convictions, and to keep laborers always under State supervision. N.C. Const. of 1868, amends. of 1875, art. XI, § 1. In our current constitution, however, hard labor was eliminated from Article XI altogether, N.C. Const. art. XI, § 1, because the people accepted the North Carolina State Constitution Study Commission's

---

(discussing the Exclusive Emoluments Clause, the Hereditary Emoluments and Honors Clause, and the Perpetuities and Monopolies Clause and making a cursory analogy to Article I, Section 27's predecessor, including its Excessive Bails Clause and Excessive Fines Clause).

recommendation to do so, *see* N.C. State Const. Study Comm'n, *Report of the North Carolina State Constitution Study Commission* 65, 88–89 (1968), https://www.ncleg. gov/Files/Library/studies/1968/st12308.pdf. In making this recommendation, the Commission noted that hard labor as punishment was "an obsolete practice." *Id.* at 89.

In 1996, the people again altered Article XI by adding new, alternative punishments such as probation, restitution, and community service.[15] These reform efforts were intended to improve the offender's chances of rehabilitation and to relieve prison overcrowding. *State Constitution* (2d ed.) 193.

As can be seen, each change to the text of Article XI over the years reflects a decision made by the people—not judges—about what punishments are constitutionally permissible.[16] When the people desired to restrict—and eventually

---

[15] An Act to Repeal the Law Providing That a Defendant May Choose Imprisonment Rather Than Probation or An Alternative Punishment and to Amend the Constitution to Provide That Probation, Restitution, Community Service, Work Programs, and Other Restraints on Liberty Are Punishments That May Be Imposed on a Person Convicted of a Criminal Offense, ch. 429, § 2, 1995 N.C. Sess. Laws 1158, 1158 (adding to the text of Article XI alternative punishments such as the "suspension of a jail or prison term with or without conditions, restitution, community service, restraints on liberty, [and] work programs").

[16] The concurrence opines that *judges* must periodically alter the constitution's meaning to keep abreast of society. It seemingly would be content, if need be, to excise the people from these calculations and to create constitutional parameters that the people had no voice in shaping. Indeed, in the concurrence's view, Article I, Section 27's protections morph over time, turning on "prevailing beliefs" and "evolving understandings of adolescence and punishment," or "modern science and legal developments." And rather than rely on the citizenry to account for these developments through their legislators changing penal laws or the constitutional amendment process, *see generally* N.C. Const. art. XIII (providing for constitutional amendments and revisions), the concurrence would brazenly empower judges

forbid—"degrading" or "obsolete" methods of punishment, or to make specific provision for emerging methods of punishment, they ratified amendments to Article XI, leaving Article I, Section 27 unaltered. As discussed above, by setting the "ceiling" for criminal punishments in Article XI, the people gave the General Assembly certain parameters within which it could freely set sentencing policies without transgressing Article I, Section 27's proscription of "cruel or unusual" punishments. In other words, the people prescribe the outer limits on punishment via Article XI, and any punishment within that outer limit is neither cruel nor unusual. As shown, our Cruel or Unusual Punishments Clause cases reflect this understanding. *See, e.g.*, *Stansbury*, 230 N.C. at 591, 55 S.E.2d at 187. Thus, because Article XI—which has no counterpart in the Federal Constitution—expressly authorizes imprisonment without limitations based on the age of the offender, it is plain that a statute

---

to determine, without direction from the people, when the General Assembly's prescribed punishments have become cruel or unusual.

But because it was "[w]e[ ] the people," not we the Justices, who ordained and established the constitution, N.C. Const. pmbl., this Court must take a different view, *see* *Atkinson*, 275 N.C. at 320, 167 S.E.2d at 261 ("The constitutionality of a state statute cannot be determined by taking a Gallup poll of the opinion of the public with reference to the efficacy or the morality of a statute authorizing the imposition of [a punishment] . . . . The power of a sovereign . . . to enact legislation is . . . not [to be determined] by public opinion polls or by writings in sociological journals or treatises."). The people, who are the repository of all political power, must be included in this inquiry. If the "prevailing beliefs" about what constitutes a "cruel" or "unusual" punishment have truly changed, the people may express their will through their elected representatives in the General Assembly and, when necessary, a constitutional amendment. The constitution does not empower judges to judicially amend it. *See* N.C. Const. arts. IV, XIII. This truth is particularly applicable in the case of Article I, Section 27. The people did not delegate the power to make penal policy to the judicial branch; rather, they assigned it to their representatives in the General Assembly.

prescribing life without parole—or a court's sentencing order inflicting a punishment in accordance therewith—cannot be "cruel or unusual" within the meaning of Article I, Section 27, regardless of the age of the offender. *See, e.g.*, *Allen*, 346 N.C. at 737, 488 S.E.2d at 191 ("We conclude that the term 'life imprisonment without parole' falls within the meaning of the constitutional term 'imprisonment,' so the sentence was authorized by the [state] [c]onstitution."); *cf. State v. Womble*, 343 N.C. 667, 688, 473 S.E.2d 291, 303 (1996) (holding the defendant's argument that "execution of juveniles constitutes cruel and unusual punishment in violation of the . . . North Carolina Constitution[ ] . . . is without merit" because "[t]his Court has repeatedly held that the North Carolina death penalty statute, which provide[d] that a person *seventeen years old* or older who commits first-degree murder may be sentenced to death, is not unconstitutional" (emphasis added) (citing *State v. Skipper*, 337 N.C. 1, 58, 446 S.E.2d 252, 284 (1994) (collecting cases))), *invalidated on other grounds by Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005).[17]

---

[17] The concurrence struggles to overcome this plain reading, and instead it seeks to smuggle in confusion where none exists. Despite the conspicuous absence of *any* limitations based on the age of an offender in Article XI, it would impute one by virtue of the following language: "The object of punishments being not only to satisfy justice, but also to reform the offender and thus prevent crime." N.C. Const. art. XI, § 2. Although this statement does set out the constitution's "penal philosophy," the section then expressly authorizes the death penalty for murder. This evinces the people's determination that those who commit murder— and the other enumerated crimes—may be incapable of reform. *State Constitution* 158. Ultimately, however, the people placed the responsibility of balancing justice, crime prevention, and rehabilitation on the General Assembly, N.C. Const. art. XI, § 2, through which they express their will by the acts of their elected lawmakers, *e.g.*, *Jones*, 116 N.C. at 570, 21 S.E. at 787.

### 5. *Interplay with the Eighth Amendment*

As stated above, the Eighth Amendment's proscription of the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, is the supreme law of the land, *id.* art. VI, cl. 2, and applicable to the States, *see Robinson,* 370 U.S. at 666–67, 82 S. Ct. at 1420–21. Therefore, this Court must ensure that the Federal Constitution's protections are given full effect regardless of how we construe the state constitution.

This Court's early cases applying both Article I, Section 27 and the Eighth Amendment continued to apply the traditional rule that a sentence was neither cruel nor unusual so long as it did not exceed the limits fixed by a constitutional statute or common law. *E.g., Greer,* 270 N.C. at 146, 153 S.E.2d at 851. In fact, in several cases,

---

In addition to its strained use of Article XI, Section 2, the concurrence relies on Article I, Section 15, where the people declared their "right to have the privilege of an education" and imposed "the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. It further cites Article IX, Section 1, which, in full, states, "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged." N.C. Const. art. IX, § 1. These provisions certainly evince our State's resolve to foster an upright, capable citizenry—even from youth. Textually, however, they tell us nothing about what makes a punishment cruel or unusual.

Similarly, the concurrence's characterization of *James* as an intentional shift towards "modern principles" of juvenile sentencing is patently incorrect. In the first place, *James* did not cite to Article I, Section 27, making its applicability to the present inquiry strained at best. *See* 371 N.C. at 78–99, 813 S.E.2d at 198–211. Moreover, the concurrence seemingly overlooks *James*'s grounding in statutory interpretation, federal caselaw, and constitutional principles rather than nebulous sociological concepts. The Court in *James* discussed *Miller*'s federal requirement that sentencing authorities must consider the relevant differences between children and adults in the context of *James*'s conclusion that the *Miller*-Fix Statute was not "unconstitutionally arbitrary or vague[ ]" under the Eighth Amendment. *Id.* at 94–97, 813 S.E.2d at 207–209. It further held that the statute did not constitute an ex post facto law or create a presumption in favor of the imposition of a sentence of life without parole. *Id.* at 84–93, 97–99, 813 S.E.2d at 201–07, 209–11. Simply put, the concurrence is wrong about *James*'s applicability to how this Court interprets and applies Article I, Section 27.

this Court observed that "[t]he [f]ederal rule coincide[d] with the North Carolina rule." *Mitchell*, 283 N.C. at 471, 196 S.E.2d at 742 (citing *Martin v. United States*, 317 F.2d 753, 755 (9th Cir. 1963)); *accord, e.g., Frank*, 284 N.C. at 147, 200 S.E.2d at 176; *Tolley*, 290 N.C. at 362, 226 S.E.2d at 364 (collecting cases).[18] Over time,

_____

[18] The concurrence insists that we should primarily frame any historical understanding of the Cruel or Unusual Punishments Clause around the 1971 constitution. So framed, the concurrence posits that this Court should consider it significant that in 1971, which was after the Supreme Court recognized that the Eighth Amendment was applicable to the States, the people again chose to use the disjunctive "or." It insists that this means that the people indisputably intended for Article I, Section 27's proscription of cruel or unusual punishments to provide more protection than the Eighth Amendment's proscription of cruel and unusual punishments. The concurrence's position suffers from several flaws.

First, this Court did not adopt the concurrence's view in the early cases interpreting the 1971 constitution. *See, e.g., Mitchell*, 283 N.C. at 471, 196 S.E.2d at 742; *Frank*, 284 N.C. at 147, 200 S.E.2d at 176; *Tolley*, 290 N.C. at 362, 226 S.E.2d at 364.

Second, the 1971 constitution did not create the Cruel or Unusual Punishments Clause. Rather, the 1971 constitution carried over the Clause from Article I, Section 14 of the 1868 constitution, which itself adopted the Clause from Section X of the Declaration of Rights in the 1776 constitution. And as discussed above, the Cruel or Unusual Punishments Clause has even more ancient roots, stemming from the English Bill of Rights. The modern text remains in line with that found in our earlier constitutions. Thus, analysis of Article I, Section 27 must begin with the 1776 constitution and the context in which the people adopted the provision. *See, e.g., Harper*, 384 N.C. at 351–64, 886 S.E.2d at 431–39 (noting that "[t]he [Free Elections C]lause first appeared in the 1776 constitution," acknowledging its roots in English law, and then explaining how the Clause evolved through the 1868 and 1971 constitutions). To pretend that constitutional history began in 1971 would require this Court to turn a blind eye to centuries of constitutional and precedential context paramount in understanding the Cruel or Unusual Punishment Clause's meaning and scope.

Third, the historical context in which the people enacted the 1971 constitution lacks much persuasive value. The Study Commission that proposed the 1971 constitution stated that it was principally concerned with "clarity and consistency of language" and that although "[s]ome of the changes [were] substantive, . . . *none [were] calculated to impair any present right of the individual citizen or to bring about a fundamental change in the power of state and local government or the distribution of that power.*" *Report of the North Carolina State Constitution Study Commission* 10 (emphasis added); *see also Berger*, 368 N.C. at 643, 781 S.E.2d at 255 (stating the primary goal of the 1971 constitution was "editorial pruning, rearranging, rephrasing, and modest amendments" and that "the great majority of the changes embraced in the [1971] constitution [took] the form of [non-substantive] deletions of

however, federal courts began to read more protection into the Eighth Amendment. Thereafter, even if Article I, Section 27 did not provide the same protection, meaning a sentence would have survived the state constitution's traditional scrutiny, this Court dutifully invalidated sentences that transgressed the Eighth Amendment's changing safeguards. *See, e.g.*, *State v. Carroll*, 282 N.C. 326, 333–34, 193 S.E.2d 85, 89–90 (1972).

Thus, although the Cruel or Unusual Punishments Clause now generally provides less protection for criminal defendants than its Eighth Amendment counterpart, this Court, "in recognition of the supremacy of the Federal Constitution," has routinely applied Article I, Section 27 the same way as the Eighth Amendment—i.e., in lockstep. *Kelliher*, 381 N.C. at 612, 873 S.E.2d at 403 (Newby, C.J., dissenting);

---

or contractions in language" (quoting *Report of the North Carolina State Constitution Study Commission* 71, 73)). Our precedents have repeatedly relied on the Study Commission's characterization of its edits as non-substantive. *E.g.*, *N.C. State Bar v. DuMont*, 304 N.C. 627, 636, 286 S.E.2d 89, 95 (1982) ("An intent to modernize the language of the existing constitution does not, in our opinion, show that the framers of the 197[1] [c]onstitution intended that instrument to enlarge upon the rights granted by the 1868 [c]onstitution. Indeed, we think that such an intent shows that the 197[1] framers intended to preserve intact all rights under the 1868 [c]onstitution."); *Sneed*, 299 N.C. at 616, 264 S.E.2d at 112 (concluding, with respect to the substantive purpose of the 1971 constitution, that "we cannot read into the voice of the people an intent that in all likelihood had no occasion to be born").

Fourth, the concurrence's position that the 1971 constitution evinced the people's unquestionable intention to adopt protections above and beyond those afforded by the Eighth Amendment suffers from a practical shortcoming. If the people intended to incorporate the Eighth Amendment's protections by reference and enshrine more protections, there was no reason to reinclude Article XI's provisions concerning the availability of punishments. Indeed, the people would have expected the judicial branch to simply refer to federal caselaw interpreting the Cruel and Unusual Punishments Clause to determine what punishments were allowed or disallowed. But this interpretation would render Article XI superfluous. The people certainly did not intend this meaning.

*accord, e.g.*, *Green*, 348 N.C. at 603 & n.1, 502 S.E.2d at 828 & n.1 (rejecting calls to read broader protections into Article I, Section 27, specifically highlighting the lack of "any compelling reason to adopt such a position"); *Medley v. N.C. Dep't of Corr.*, 330 N.C. 837, 842–45, 412 S.E.2d 654, 658–59 (1992) (construing the Eighth Amendment and Article I, Section 27 simultaneously to impose the same nondelegable duty to provide inmates adequate medical care upon the State); *State v. Peek*, 313 N.C. 266, 275–76, 328 S.E.2d 249, 255–56 (1985) (reviewing Eighth Amendment and Article I, Section 27 claims under the same standard and ultimately determining that a defendant's sentence did not violate either constitution). That is, even when a defendant asserts a constitutional challenge to his sentence under the state constitutional proscription of cruel *or* unusual punishments, this Court examines his claims "in light of the general principles enunciated by this Court and the Supreme Court [of the United States] guiding cruel *and* unusual punishment analys[e]s." *Green*, 348 N.C. at 603, 502 S.E.2d at 828 (emphasis added).

Relevant here, although a truly independent interpretation of the *state constitution* would mean life without parole sentences for juveniles are not "cruel or unusual" punishments, the Eighth Amendment provides juvenile offenders protections that Article I, Section 27 does not, including heavily restricting the availability of life without parole sentences. *See, e.g.*, *Miller*, 567 U.S. at 479–80, 489, 132 S. Ct. at 2469, 2475 (ending mandatory life without parole sentences for juvenile offenders but allowing discretionary life without parole sentences for juvenile

offenders); *Montgomery*, 577 U.S. at 208–09, 136 S. Ct. at 733–34 (clarifying that life without parole is forbidden for juvenile offenders whose crimes only "reflect the transient immaturity of youth"). Therefore, the Court of Appeals properly evaluated defendant's constitutional challenge under the general principles guiding the Cruel *and* Unusual Punishment Clause analysis, and defendant's initial argument that the Court of Appeals needed to consider his claims under the "more protective" state constitution fundamentally fails.

## B. Merits Review of Defendant's Constitutional Challenge

We now turn to consider defendant's contention that the Court of Appeals totally denied merits review of his constitutional challenge to his sentences. Our review of the Court of Appeals' opinion reveals that it addressed the arguments defendant presented. Indeed, the Court of Appeals fully resolved defendant's challenges to the trial court's findings of fact, weighing of mitigating factors, and application of legal standards and found no error. *Tirado II*, slip op. at 8–13, 15–17. Importantly, the court also fully addressed defendant's constitutional attacks on his sentences, observing that the trial court complied with "*Miller* and its progeny," as well as North Carolina's discretionary sentencing procedure, by "consider[ing] all relevant mitigating circumstances and evidence before deciding whether to impose [life without parole] sentences." *Id.* at 13–15. The Court of Appeals then addressed the heart of defendant's constitutional argument—that consecutive sentences of life without parole were inappropriate because "the 'evidence established that

[defendant] was not one of the rare juveniles who is permanently incorrigible or irreparably corrupt.' " *Id.* at 15 (alteration in original). The Court of Appeals rejected this argument, concluding that "the evidence shows otherwise"—namely, that defendant's crimes show he was one of the rare, permanently incorrigible juveniles for whom a sentence of life without parole was appropriate. *Id.* After considering all of defendant's arguments, the Court of Appeals concluded, "In sum, the resentencing in defendant's case complied with binding statutory authority and case law precedent as the sentence imposed was not mandatory and because the trial judge had the discretion to impose a lesser punishment in light of defendant's youth." *Id.*

Defendant's argument that the Court of Appeals declined to perform merits review of his constitutional challenge appears to hang on one concluding sentence in the Court of Appeals' analysis: "For these reasons, and those discussed above, we need not address any as-applied constitutional challenge." *Id.* (citing *State v. Goodman*, 298 N.C. 1, 20, 257 S.E.2d 569, 582 (1979)). As we have shown, however, the Court of Appeals confirmed that defendant received a constitutional sentence under both the United States Constitution and the North Carolina Constitution by ensuring that the trial court complied with all requirements imposed by statute and caselaw, properly considered all the mitigating evidence, and imposed an appropriate, proportional sentence. And contrary to defendant's assertions, the Court of Appeals did not hold that *Jones* foreclosed as-applied challenges to sentences. Any inartful wording notwithstanding, the Court of Appeals provided comprehensive

merits review of defendant's constitutional arguments.

## C. Compliance with *State v. Kelliher*

Finally, in response to our special order's directive, defendant concedes that on the facts of this case, the trial court's sentencing did not run afoul of *State v. Kelliher*, 381 N.C. 558, 873 S.E.2d 366 (2022). We have conducted an independent review of the trial court's resentencing order and conclude that the order does not implicate *Kelliher* at all for at least two reasons.

First, defendant, whom the trial court expressly found to be irreparably corrupt and sentenced to consecutive sentences of life *without* parole, is not a member of the narrow subset of juvenile homicide offenders to which *Kelliher* could apply. The narrow question before the Court in *Kelliher* was whether sentencing the defendant to two consecutive sentences of life *with* parole for his two first-degree murder convictions was unconstitutional when the trial court expressly found that the defendant was neither incorrigible nor irredeemable. *Id.* at 560–66, 597, 873 S.E.2d at 370–74, 393–94 (forging a theory of de facto life sentences to answer the question affirmatively). Accordingly, *Kelliher* applies only to juvenile homicide offenders whom the trial court (1) expressly finds to be neither incorrigible nor irredeemable and (2) sentences to multiple, consecutive terms of life *with* parole. *Id.* at 561–64, 873 S.E.2d at 371–73. Because defendant does not meet either of these criteria, *Kelliher* is facially inapplicable to his case.

Second, the only portion of the *Kelliher*'s analysis that is arguably applicable

to the present case is nonbinding obiter dictum. *See generally, e.g., Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) ("Language in an opinion not necessary to the decision is obiter dictum and later decisions are not bound thereby." (emphasis omitted)). *Kelliher* suggested that Article I, Section 27 requires a trial court to "expressly find[ ] that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated" before sentencing him to life without parole. 381 N.C. at 587, 873 S.E.2d at 387 (dictum). Because the trial court there had expressly found that the defendant was "neither incorrigible nor irredeemable," however, the defendant was already constitutionally ineligible for a life without parole sentence. *See Montgomery*, 577 U.S. at 208–09, 136 S. Ct. at 733–34. Thus, the statement requiring the trial court to make an express finding of incorrigibility before sentencing a defendant to life without parole was unnecessary in determining the outcome of the case. *See State v. Borlase*, 896 S.E.2d 742, 749–50 (N.C. Ct. App. 2024). Therefore, this portion of *Kelliher* was obiter dictum, and regardless of whether the trial court in the present case made an express finding of defendant's incorrigibility, it did not risk running afoul of *Kelliher*. *Cf. Jones*, 141 S. Ct. at 1313 (concluding separate findings of a juvenile defendant's incorrigibility are not required).

## III.   Conclusion

In sum, the Court of Appeals properly analyzed defendant's state constitutional objections to his consecutive sentences of life without parole. As we

have explained, Article I, Section 27 provides *less* protection for juvenile criminal defendants than the Eighth Amendment. Because North Carolina courts lockstep the application of the Cruel or Unusual Punishments Clause with the federal constitutional analysis to ensure that no citizen is deprived of the Eighth Amendment's guarantees, the Court of Appeals had no reason to separately analyze defendant's constitutional argument under the state constitution. Thus, defendant's assertion that his claim should have been considered under the "more protective" state constitution fails. Furthermore, the Court of Appeals comprehensively addressed all the arguments that defendant presented. Therefore, the Court of Appeals' analysis was proper. Finally, the sentencing order in this case does not implicate, and therefore did not run afoul of, *Kelliher*. For these reasons, the decision of the Court of Appeals is affirmed.

AFFIRMED.

Justice BERGER concurring.

I concur with the majority but write separately because my concurring colleague's discussion of *Kelliher* and the precedential weight to which it is entitled misses the mark. That opinion squarely addressed findings that should be made by a trial court when sentencing juvenile defendants convicted of homicide. But the decoupling of Article I, Section 27 from the Eighth Amendment in *Kelliher* did not cement this ruling as binding precedent because it is wildly inconsistent with our prior case law.

The concurrence acknowledges that "we did indeed take a lockstep approach, treating [Article I,] Section 27 as a carbon copy of the Eighth Amendment" in cases leading up to and including *Green*.[1] In fact, the concurrence also states in a footnote that defendant here has conceded "Section 27 and the Eighth Amendment prescribe identical standards."

So, what in the text of Article I, Section 27 changed between *Green* and *Kelliher*? Well, nothing at all.

---

[1] The concurrence also suggests that *State v. James*, 371 N.C. 77 (2018), is the fork-in-the-road case which supports *Kelliher's* rationale; however, Article I, Section 27 is never referenced in *James*. The only opinions from this Court which depart from lockstepping Article I, Section 27 and the Eighth Amendment are *Kelliher* and *Conner*. Both were issued on the same day, and both are rooted in evolving policy preferences, not reliance on precedent. Discussion of *Kelliher's* precedential weight herein also applies to *Conner*.

While every policy consideration set forth in *Kelliher* and reiterated in the concurrence here "may be very sensible," they are not found in our state Constitution. Antonin Scalia, *Scalia Speaks: Reflections on Law, Faith, and Life Well Lived* 192 (Christopher J. Scalia & Edward Whelen eds., 2017). In addition, and critical to the discussion of precedent, the reasoning in *Kelliher* did not flow from a series of decisions issued by this Court. Because *Kelliher* is an isolated opinion met with a well-reasoned dissent, it is entitled to little precedential weight.

Legal commentators have stated that "the principle of stare decisis proclaims, in effect, that where a principle of law *has become settled by a series of decisions*, it is binding on courts and should be followed in similar cases." Allyson K. Duncan & Frances P. Solari, *North Carolina Appellate Advocacy* § 1–9, at 8 (1989) (emphasis added). Indeed, this Court has stated that, contrary to the creative approach in *Kelliher*, "[t]he principle of stare decisis directs this Court to *adhere to its long-established precedent* to provide consistency and uniformity in the law." *West v. Hoyle's Tire & Axle, LLC*, 383 N.C. 654, 659 (2022) (emphasis added). *See also State v. Ballance*, 229 N.C. 764, 767 (1949) ("[W]here a principle of law has become *settled by a series of decisions*, it is binding on the courts and should be followed in similar cases." (emphasis added)); *Lowdermilk v. Butler*, 182 N.C. 502, 506 (1921) ("[A] point which has *often been adjudged* should be permitted to rest in peace." (emphasis added) (citing *Spicer v. Spicer*, Cro. Jac. 527, 79 Eng. Reprint, 451; 1 Kent's Com. 477)); *Harper v. Hall*, 384 N.C. 292, 374 (2023) ("[The previous opinion of the Court]

does not meet any criteria for adhering to *stare decisis*—it is neither long-standing nor has it been relied upon in other cases."); *Williamson v. Rabon*, 177 N.C. 302, 307 (1919) ("[A] single decision can seldom serve as a basis for stare decisis . . . ." (cleaned up)); *State v. Walker*, 385 N.C. 763, 769 (2024) (Berger, J., concurring) ("Put another way, an isolated holding may be persuasive, but it is not binding . . . .").

Although we tether our reasoning to prior decisions "both out of respect for the opinions of our predecessors and because it promotes stability in the law and uniformity in its application," *Wiles v. Constr. Co.*, 295 N.C. 81, 85 (1978),[2] "*stare decisis* has never been treated as an inexorable command." *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020) (cleaned up).

"When we are presented with *a single decision* which we believe to have been inadvisedly made, it is encumbent on us to overrule it if we entertain a different opinion on the question submitted." *Sidney Spitzer & Co. v. Comm'rs of Franklin Cnty.*, 188 N.C. 30, 32 (1924) (cleaned up) (emphasis added). *See also Ballance*, 229 N.C. at 767 ("[S]tare decisis will not be applied . . . to preserve and perpetuate error

---

[2] The Supreme Court of the United States has articulated that "[s]tare *decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 916 (2018) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827 (1991)).

and grievous wrong."); *Patterson v. McCormick*, 177 N.C. 448, 457 (1919) ("The rule of stare decisis cannot be applied to perpetuate error.").[3]

*Kelliher*, however, did not suggest that our prior precedent was wrong, only that, as admitted by the concurrence here, our Constitution "evolved" along with other policy considerations. But, a legal rule, like the lockstepping of the Eighth Amendment and Article I, Section 27, does not simply evaporate because constitutional evolutionists decide to chart a new course. We have explicitly recognized that an isolated decision, especially one that departs from long-standing principles, does not carry the binding weight of stare decisis. This ensures that the Court's jurisprudence is built on well-considered and consistent rulings rather than outliers and one-offs. *Kelliher* is an outlier, and this Court appropriately corrects course today.

Justice BARRINGER and Justice ALLEN join in this concurring opinion.

---

[3] The concurrence argues, based upon a law review article written after *Kelliher*, that our prior jurisprudence on this issue was the result of a mistake—a claim which, even if true, would not change *Kelliher's* value as precedent. An isolated opinion, like *Kelliher*, is hardly a settled principle. *See Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015) ("An argument that . . . we got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent. Or otherwise said, it is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a 'special justification'—over and above the belief 'that the precedent was wrongly decided.' . . . Respecting stare decisis means sticking to some wrong decisions." (citation omitted)).

Justice EARLS concurring in the result only.

The Court today resolves two narrow questions: whether the Court of Appeals considered Mr. Tirado's claim under Article I, Section 27 of North Carolina's Constitution, and whether Mr. Tirado's sentence complies with *State v. Kelliher*, 381 N.C. 558 (2022). As the majority explains, the Court of Appeals reviewed the merits of Mr. Tirado's state constitutional claim, and his sentence aligns with *Kelliher*. On these points, the Court rightly affirms the decision below. I therefore concur in the result.

But the majority ventures beyond the issues before us to offer a gratuitous and sweeping commentary on Section 27 and its overlap with the Eighth Amendment. This discussion is pure dicta. It strays into areas this Court deliberately excluded from its review and addresses questions the parties do not contest, brief, or argue. This portion of the opinion is logically irrelevant to this Court's ruling and therefore nonbinding. On the merits, too, I disagree with the propositions asserted by the majority about the meaning and scope of Section 27.

## I.  The Majority's Discussion of Section 27 is Dicta.

A dictum is "an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner." *See* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1256 (2006). Said differently, any "[l]anguage in an opinion not necessary to the decision

is . . . dictum, and later decisions are not bound thereby." *See Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs.,* 313 N.C. 230, 242 (1985). This rule rests on principles of pragmatism and judicial restraint. *See Moose v. Bd. of Comm'rs*, 172 N.C. 419, 433–34 (1916). Because judges cannot predict the future or foresee how a decision will "bear[ ] on all other cases," an opinion's language is necessarily tethered to "the facts of the case under consideration." *Id.* at 434 (cleaned up). Relevant, too, is the judiciary's assigned function: deciding the questions "presented to it for solution in the proper course of judicial proceedings." *Hayes v. City of Wilmington*, 243 N.C. 525, 537 (1956) (cleaned up).

In line with that role, "[o]fficial character attaches only to those utterances of a court which bear directly upon the specific and limited questions" properly before it. *Id.* (cleaned up). The inverse is also true—statements "[o]ver and above what is needed for the solution of these questions" are "unofficial." *Id.* (cleaned up); *see also Over-Look Cemetery, Inc. v. Rockingham Cnty.*, 273 N.C. 467, 471 (1968) (explaining that an "expression of opinion upon an incidental question not presented in the appeal" lacks "the force of an adjudication upon the point" (quoting *Miller v. Lash*, 85 N.C. 51, 56 (1881))). This means that assertions made "by the reviewing court, or by the writing justice, on points arising outside of the case and not embodied in the determination made by the court" are "rendered without jurisdiction or at least extrajudicial." *Hayes*, 243 N.C. at 536–37 (cleaned up).

Under our precedent, a statement is dictum if it (1) goes beyond the "specific

and limited questions" that are "actually presented" or (2) is not "necessarily involved in determining the case." *Id.* at 536–37; *see also State v. Spence*, 274 N.C. 536, 542 (1968) (instructing that a statement is dictum if it was not "directly presented" for review or "necessary to a decision"). The majority's Section 27 discussion meets both prongs.

To start, the scope of Section 27's protections is not "directly presented" by Mr. Tirado's appeal. *Id.* This case's path to this Court makes that clear. Mr. Tirado sought discretionary review on two precise issues. This Court, in a special order, allowed just one without changing Mr. Tirado's formulation: "Did the Court of Appeals fail to consider Mr. Tirado's claim under Article I, Section 27 of the North Carolina Constitution?" We also directed the parties to address whether Mr. Tirado's sentence complied with *Kelliher*, 381 N.C. 558. Our review is thus confined to these two discrete questions—nothing more. See N.C. R. App. P. 16(a) ("[R]eview in the Supreme Court is limited to consideration of the issues stated in . . . the petition for discretionary review . . . unless further limited by the Supreme Court . . . ."); *Cherry Cmty. Org. v. Sellars*, 381 N.C. 239, 256 (2022) ("Unless a party asserts the right to appeal by virtue of the presence of a dissenting opinion within the Court of Appeals' decision in a case, our review is limited to consideration of the issues stated in the petition for discretionary review and the response thereto and properly presented in the new briefs." (cleaned up)).

Given the scope of our review, this case is straightforward. In response to our

special order, Mr. Tirado concedes that his sentence complies with *Kelliher*.[1] The trial

court expressly found him to be "permanently incorrigible," placing him outside

*Kelliher*'s protective scope. The State concurs.[2] So the only remaining issue is whether

the Court of Appeals failed to review Mr. Tirado's state constitutional claim.[3] The

---

[1] Mr. Tirado has repeated this admission at every turn, including in his opening brief, his reply brief, and at oral argument. *See* Appellant's New Br. at 27, State v. Tirado, No. 267PA21 ("The trial court complied with the procedural requirements laid out in *Kelliher*."); *id.* at 30 (conceding that trial court complied with *Kelliher* but clarifying that the "issue in this matter does not rely on *Kelliher*'s holding that the North Carolina Constitution requires more than the United States Constitution, but rather on the complete denial of appellate review of [Mr. Tirado's] as-applied challenge to his sentence"); *see* Appellant's Reply Br. at 2, State v. Tirado, No. 267PA21 ("As Mr. Tirado acknowledges in his opening brief . . . *Kelliher* does not apply to his case, which inherently results in his claim being functionally analyzed under the North Carolina Constitution just as it would be under the United States Constitution."); Oral Argument at 8:35, *State v. Tirado* (No. 267PA21) (Sept. 25, 2024), https://www.youtube.com/watch?v=PhzjanIaKIU (last visited December 4, 2024) ("The issue I brought was whether the [Court of Appeals] improperly denied merits review of my client's as-applied Article I, Section 27 claim. This Court directed that we address *Kelliher*. Both the State and I agree that *Kelliher* does not have any direct applicability to that question in this case.").

[2] *See* Oral Argument at 18:24, *State v. Tirado* (No. 267PA21) (Sept. 25, 2024), https://www.youtube.com/watch?v=PhzjanIaKIU (last visited December 4, 2024) ("Defendant here now concedes in his briefing before this Court that, in his circumstances, the State Constitution provides no broader protection than the Eighth Amendment. So he's essentially said, 'Although this Court has, in *State v. Kelliher* interpreted the Eighth Amendment and Section 27 as not needing to be interpreted in lockstep, they should be interpreted in lockstep for purposes of his case.' So he's conceded that there's not some kind of broader protection that he is entitled to under the State Constitution here."); *id.* at 29:03 ("[T]his Court has directed the parties to address whether or not Defendant's resentencing here complied with this Court's recent decision in *State v. Kelliher*. And again, Defendant has conceded this issue. He's agreed that under the precedent set by *Kelliher*, Defendant's sentence was, was compliant."); *id.* at 31:06 ("Defendant has, in essence, conceded before this Court that he's not entitled to any greater protection under the State Constitution, and he's conceded that the trial judge here complied with the requirements of Kelliher.").

[3] Again, Mr. Tirado made this clear in his briefs before this Court, as well as during oral argument. *See* Appellant's New Br. at 22, State v. Tirado, No. 267PA21 ("When [Mr. Tirado] brought his claims to the Court of Appeals, they refused to provide merits review of his claim that his sentence of LWOP was unconstitutional as-applied to him. If North Carolina is going to permit trial courts to sentence children to die in prison, surely those children should receive the appellate review to which they are entitled."); *id.* at 30 ("The issue

parties disagree on this procedural point. Mr. Tirado contends that the lower court "simply did not review" this issue, while the State maintains that the court "*did* acknowledge and rule on [Mr. Tirado's] state constitutional challenge." Past that narrow dispute, however, the parties see eye to eye. Both agree that Section 27, applied to Mr. Tirado's case, does not extend distinct or broader protections than the Eighth Amendment.[4] And so neither party asks us to wade into the constitutional

---

in this matter does not rely on *Kelliher*'s holding that the North Carolina Constitution requires more than the United States Constitution, but rather on the complete denial of appellate review of [Mr. Tirado's] as-applied challenge to his sentence."); *see also* Oral Argument at 8:35, *State v. Tirado* (No. 267PA21) (Sept. 25, 2024), https://www.youtube.com/watch?v=PhzjanIaKIU (last visited December 4, 2024) ("The issue I brought was whether the [Court of Appeals] improperly denied merits review of my client's as-applied Article I, Section 27 claim. This Court directed that we address *Kelliher*. Both the State and I agree that *Kelliher* does not have any direct applicability to that question in this case."); *id.* at 9:34 ("[T]hat is the very narrow issue here: Did Paco Tirado not get appropriate appellate review of his as-applied challenge because the Court of Appeals improperly analyzed the meaning and the holding of *Jones*?"); *id.* at 12:01 ("The State in their brief seems to try to argue that the issue that I have brought to this Court is that difference [between the Eighth Amendment and Section 27]. It is not. The issue to be briefed was was [Mr. Tirado] improperly denied merits review of his Article I, Section 27 claim that his sentence was unconstitutional? That's what we're here for."); *id.* at 35:33 ("This case is simple. The issue to be briefed was whether [Mr. Tirado] was improperly denied merits review of his Article I, Section 27 challenge, and the answer to that is clear. I ask that you remand this case to the Court of Appeals for them to conduct the proper merits review.").

[4] Mr. Tirado admits that, on these facts, Section 27 and the Eighth Amendment prescribe identical standards. *See* Appellant's Reply Br. at 2, State v. Tirado, No. 267PA21 ("As Mr. Tirado acknowledges in his opening brief . . . *Kelliher* does not apply to his case, which inherently results in his claim being functionally analyzed under the North Carolina Constitution just as it would be under the United States Constitution."); *see also* Oral Argument at 7:05, *State v. Tirado* (No. 267PA21) (Sept. 25, 2024), https://www.youtube.com/watch?v=PhzjanIaKIU (last visited December 4, 2024) ("[I]n [Mr. Tirado's] case, these things are the same, the Eighth Amendment and Article I, Section 27."); *id.* at 12:01 ("The State in their brief seems to try to argue that the issue that I have brought to this Court is that difference [between the Eighth Amendment and Section 27]. It is not. The issue to be briefed was [Mr. Tirado] improperly denied merits review of his Article I, Section 27 claim that his sentence was unconstitutional? That's what we're here for."). The State, too, does not ask this Court to address any potential constitutional daylight between

substance of Section 27 or its interplay with the Eighth Amendment. That issue is simply not before us.

The majority answers the narrow question in dispute, concluding that the Court of Appeals did not withhold review of Mr. Tirado's state constitutional claim. That court, as the majority explains, reached and considered the substance of his constitutional arguments. While some of the opinion's language may have been inartful, the court reviewed the permissibility of Mr. Tirado's sentence under the state and federal constitutions. On this point, I agree.

That should end the matter. With *Kelliher* conceded and the state constitutional claim reviewed, there is nothing left to decide. By affirming the Court of Appeals—both its analysis and the bottom-line decision—the majority resolves everything properly before us. *See Est. of Fennell v. Stephenson*, 354 N.C. 327, 331–32 (2001) (limiting review to issues raised in the petition for discretionary review); *State v. Miller,* 369 N.C. 658, 671–72 (2017) (declining to address issues not included in the petition). Our work is done.

---

Section 27 and the Eighth Amendment. *Id.* at 20:22 ("Again, in the briefing before this Court, Defendant concedes that [the Eighth Amendment and Section 27] should be interpreted in lockstep, and he's not entitled to any greater constitutional protection under Article I, Section 27 as it applies to his case right now."); *id.* at 28:43 ("To the extent that that question—does the State Constitution provide broader protection here to protect [Mr. Tirado's] sentence—[is] the issue this Court granted review on, he's conceded he's not entitled to any special protection, so certainly his sentence should not be reversed on that basis."); *id.* at 31:06 ("Defendant has, in essence, conceded before this Court that he's not entitled to any greater protection under the State Constitution, and he's conceded that the trial judge here complied with the requirements of *Kelliher*.").

The majority then ventures beyond this Court's proper task, gratuitously redefining the scope of Section 27 and its overlap with the Eighth Amendment. To defend its judicial detour, the majority mischaracterizes Mr. Tirado's arguments; it constructs a strawman that it steps in to slay. It starts by pointing to Mr. Tirado's petition for discretionary review, where he contended that "[t]he Court of Appeals did not consider whether [his] sentence was unconstitutional under Article I, [Section] 27 of the North Carolina Constitution, which provides individuals with increased protections." In that same petition, Mr. Tirado also argued that the decision below misapplied *Jones v. Mississippi*, 141 S. Ct. 1307 (2021), by "fail[ing] to consider not just [his] as-applied Eighth Amendment claim, but his claim that his sentence was unconstitutional under the more protective North Carolina Constitution." The majority notes that federal cases have read the Eighth Amendment to limit juvenile life without parole (JLWOP) to the rare child "whose crimes reflect irreparable corruption." By reading the state constitution to "provide[ ] *more* protection," the majority reasons, Mr. Tirado "effectively posit[s]" that Section 27 "totally forbid[s]" JLWOP. So in substance, says the majority, Mr. Tirado launches a facial attack on "any statute prescribing life without parole as a permissible punishment for juveniles."

This reasoning is flawed. Mr. Tirado has centered this appeal—from petition, to briefing, to oral argument—on the Court of Appeals' alleged refusal to consider his constitutional claims at all. The language quoted from his PDR only underscores that

focus. True, Mr. Tirado mentioned North Carolina's "increased protection" in passing, as part of a general observation about the scope of state versus federal constitutional rights. But these remarks were ancillary to his core argument. He did not call for this Court to redefine Section 27 but simply contextualized his procedural claim about the alleged denial of appellate review. Most tellingly, Mr. Tirado himself formulated the issues on appeal, asking us to decide whether the Court of Appeals *"fail[ed] to consider"* his Section 27 challenge to his sentence. We allowed review on that question without modifying it, even though we issued a special order directing the parties to brief a related but distinct issue.

The parties' briefs confirm the limited "scope of review on appeal." *See* N.C. R. App. P. 28(a). Neither Mr. Tirado nor the State discuss or probe the contours of Section 27, much less how it measures up to the Eighth Amendment. In fact, Mr. Tirado's brief explicitly disclaims the position the majority attributes to him. He declined to argue that Section 27 imposes a "higher substantive bar" than the Eighth Amendment. Nor does he read our cases to "establish that the North Carolina Constitution precludes sentences of life without parole categorically," distinguishing this state from others like Iowa or Massachusetts. The majority is wrong to insist that Mr. Tirado "effectively posit[s]" these points, when he expressly disavows them.

Lastly, the majority's constitutional commentary is "unnecessary to the decision." *Trustees,* 313 N.C. at 242. Although it ultimately affirms the Court of Appeals' reasoning and result, the majority spends pages justifying why that court

should not "have conducted an analysis under the state constitution's distinct protections." But the Court of Appeals did no such thing. Instead, it treated the state and federal claims as aligned and addressed them in tandem. Mr. Tirado and the State agree that Section 27 and the Eighth Amendment impose identical substantive requirements in this case. So as the majority concludes, and the parties concede, the "Court of Appeals properly evaluated [Mr. Tirado's] constitutional challenge" by using the same substantive standard to review the merits of his state and federal claims. The majority's exegesis on Section 27 responds to a counterfactual that never happened—precisely the type of "theoretical speculation" our cases decry as dicta. *See State v. Robinson*, 342 N.C. 74, 88 (1995); *In re Univ. of N.C.*, 300 N.C. 563, 575–76 (1980) (explaining that a decision's "constitutional interpretation" of the public purpose requirement for tax exemption was dicta because the ultimate ruling was "based on the premise" that plaintiff's property was held for public purposes, and it was therefore unnecessary for this Court to speculate on whether the property "would have been constitutionally tax exempt if *not* held for such purposes"); *Chavez v. McFadden*, 374 N.C. 458, 474 n.5 (2020) (concluding that the Court of Appeals' discussion on the authority of sheriffs without 287(g) agreements was dicta, as it addressed hypotheticals unrelated to a case involving a sheriff who acted under a 287(g) agreement at all times).

Fitting the pieces together, the majority's editorial on Section 27 and its overlap with the Eighth Amendment is tangential to the "ultimate holding." *Amos v.*

*Oakdale Knitting Co.,* 331 N.C. 348, 359 (1992); *cf. State v. Jackson,* 353 N.C. 495, 500 (2001) (concluding that an opinion's discussion on whether the inoperability of a gun was an affirmative defense was dicta because it was extraneous to the "actual holding": "that the State did not have to submit evidence of operability" to convict under N.C.G.S. § 14-415.1). The bottom-line rationale for our disposition here—that the Court of Appeals reviewed Mr. Tirado's state constitutional claim and that his sentence complies with *Kelliher*—stands independent of the majority's musings on Section 27. Excising this surplus commentary "would not require a change in either the court's judgment or the reasoning that supports it." Leval, *Dicta* at 1257. It plays "no functional role in compelling the judgment," *id.*, and is therefore neither "embodied in the determination made by the court" nor "necessarily involved in determining the case." *Hayes,* 243 N.C. at 536–37 (cleaned up); *see also Trustees*, 313 N.C. at 242 (reasoning that an earlier case's discussion of a statute was "unnecessary to the decision and is obiter dictum" because the opinion ultimately "affirmed the Court of Appeals' reversal of summary judgment" by applying a different statutory provision); *In re Z.G.J.,* 378 N.C. 500, 513 n.5 (2021) (explaining that assertions made in an earlier opinion were dicta because they were "irrelevant to our holding" and "had no bearing upon the Court's decision to reverse").

Our role is to decide the questions "presented to [us] for solution in the proper course of judicial proceedings," rather than to opine on "points arising outside of the case." *Hayes,* 243 N.C. at 536–37 (cleaned up). Adhering to that principle here, I

concur in the result based on the issues correctly before this Court. Beyond that, though, the majority's commentary should be left where it belongs—on the sidelines.

## II. The Majority's Dicta Dilute and Misinterpret Section 27.

The majority purports to read Section 27 as less protective than—but interpreted in lockstep with—the Eighth Amendment. This conclusion, says the majority, derives from constitutional text, history, and precedent. But at each turn, the majority's analysis is selective, incomplete, and normatively flawed.

## A. Text

The majority starts by asserting that the people use the "plain language" of constitutional provisions to "express their intended meaning of the text when they adopted it."  Extending that logic, the majority reasons that the words inscribed in the Constitution have no "hidden meanings or opaque understandings—the kind that can only be found by the most astute justice or academic." This makes intuitive sense. A constitution created by and for the people should be accessible to the people it governs.

One might think such adulation of plain language would preface a discussion of Section 27's text. Not so. Instead, the majority declares that the words of Section 27 hold little constitutional significance because that provision "does not expressly set out . . . what it means for a punishment to be 'cruel or unusual.' " Since the "use of the disjunctive 'or' does not clarify this obscurity," we are told, the "meaning the people intended" must be found elsewhere.

This reasoning is baffling. The majority extols "plain language" on one page, only to dismiss the plain language of Section 27 a few pages later. If the people's word choice is the best reflection of their intent, we must faithfully consult the language they used—even if doing so does not yield the preferred result. *See State ex rel. Martin v. Preston*, 325 N.C. 438, 449 (1989). Yet rather than grapple with Section 27's text, the majority sidesteps it.

On one score, though, the majority is correct: Section 27 does not contain a checklist of its meaning. But that is a feature rather than flaw. *See State ex rel. Attorney-General v. Knight*, 169 N.C. 333, 347–48 (1915). Constitutional provisions are written for the ages and "lay down general principles of government which must be observed amid changing conditions." *See Report of the North Carolina State Constitution Study Commission* 150 (1968), available at https://www.ncleg.gov/Files/Library/studies/1968/st12308.pdf. By design, then, they do not resemble "elaborate legislative provisions," but instead set out "briefly and clearly the fundamental principles upon which the government shall proceed." *Id.* And here, the text of Section 27 prescribes state-specific values—both in what it says and what it omits. At a minimum, Section 27's language and its constitutional trajectory confirm that its protections are distinct from, and broader than, those provided by the Eighth Amendment.

Start with Section 27's unique phrasing. Unlike the Eighth Amendment, which forbids only "cruel *and* unusual punishments," Section 27 bars punishments that are

either "cruel" *or* "unusual." *See State v. Conner*, 381 N.C. 643, 667 (2022). This Court has long recognized the significance of disjunctive versus conjunctive language. *See In re Duckett's Claim*, 271 N.C. 430, 437 (1967) ("[T]he disjunctive participle 'or' is used to indicate a clear alternative. The second alternative is not a part of the first, and its provisions cannot be read into the first."); *Routten v. Routten*, 374 N.C. 571, 575–76 (concluding that "the disjunctive term 'or' in N.C.G.S. § 50-13.5(i) establishes that either of the circumstances is sufficient to justify the trial judge's decision to deny visitation"), *cert. denied*, 141 S. Ct. 958 (2020); *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 519 (2004) (noting "that the natural and ordinary meaning of the disjunctive 'or' permits compliance with either condition").

For punishments, in particular, our cases give special weight to disjunctive phrasing. As far back as 1820, we admonished that: "If 'or' could, under any circumstances, be construed 'and' in a penal law, it must be to lessen, not to aggravate, the evil of punishment." *State v. Kearney*, 8 N.C. (1 Hawks) 53, 55 (1820). In other words, "the word 'or,' in criminal statutes, cannot be interpreted to mean 'and,' when the effect is to aggravate the offense, or increase the punishment." *State v. Walters*, 97 N.C. 489, 490 (1887). This interpretive maxim reflects ordinary language and grammar. *See id.* More fundamentally, though, it embodies a "rule of justice as well as mercy." *Id.*

Applying those principles here, the text of Section 27 casts a wider net than the Eighth Amendment. *See Conner*, 381 N.C. at 667 (explaining that Section 27

"abrogates a range of sentences which is inherently more extensive in number by virtue of the provision's disjunctive term 'or' than the lesser amount of sentences prohibited by the federal constitutional amendment due to its conjunctive term 'and' "). That is because the Eighth Amendment "requires two elements of the punishment to be present for the punishment to be declared unconstitutional ('cruel *and* unusual')," while Section 27 "only requires one of the two elements ('cruel *or* unusual')." *Id.* at 668. So while this disjunctive phrasing does not alone decode Section 27's scope, it does signal a broader sweep than its federal analogue.[5]

The trajectory of Section 27's language confirms that point. When North Carolina adopted its first constitution in 1776, it drew inspiration from its sister states but chose its own path. New Jersey's Constitution, for instance, did not mention punishments at all. *See* N.J. Const. of 1776. Pennsylvania required that

---

[5] Early cases interpreting Section 27 did not examine its distinctive phrasing or how it differed from the Eighth Amendment. In fact, some decisions "paid so little attention to this crucial difference" in language that their recitation of the constitutional standard "incorrectly substituted 'and' for 'or.' " Ben Finholt, *Toward Mercy: Excessive Sentencing and The Untapped Power of North Carolina's Constitution*, 16 Elon L. Rev. 55, 94 (2024); *see, e.g., State v. Manuel*, 20 N.C. 144, 36 (1838) ("After what has been said on the subject of excessive fines, it cannot be necessary to say much on the subject of *cruel and unusual punishments*." (emphasis added)); *State v. Reid*, 106 N.C. 714, 716 (1890) ("The defendant invokes the protection guaranteed by Article I, sec. 14, of the Constitution, which forbids excessive bail and the imposition of excessive fines or *cruel and unusual punishments*." (emphasis added)); *State v. Parker*, 220 N.C. 416, 419 (1941) ("It is well settled that when no time is fixed by the statute, an imprisonment for two years will not be held *cruel and unusual*." (emphasis added)); *State v. Greer*, 270 N.C. 143, 146 (1967) ("We have held in case after case that when the punishment does not exceed the limits fixed by statute, it cannot be considered *cruel and unusual* punishment in a constitutional sense." (emphasis added)). Scholars have therefore observed that "North Carolina's tradition of moving in lockstep with the Eighth Amendment is grounded, at least partly, in a simple mistake." *See* Finholt, at 87.

punishments be "in general more proportionate to the crimes." P.A. Const of 1776, § 38. Foreshadowing the federal provision, Virginia barred "cruel and unusual" punishments. V.A. Declaration of Rights, § 9. Delaware, however, used the "cruel *or* unusual" language. Del. Const. of 1776 Bill of Rights, § 16. North Carolina followed Delaware's lead, choosing the broader phrasing to outlaw punishments that are either cruel or unusual, not necessarily both. From the start, then, North Carolina signaled that it would chart its own course when it came to constitutional protections against excessive punishment.

For another reason, Section 27's unique language stands out. The first two versions of North Carolina's Constitution, in 1776 and 1868, used the "cruel or unusual" phrasing before the Eighth Amendment applied to the states. This means that when North Carolina crafted and reaffirmed Section 27, the federal Eighth Amendment had no binding effect on state law. At the time, the state constitution was the sole protection against excessive punishment for North Carolinians. The choice of "cruel or unusual" over "cruel and unusual" was a conscious effort to provide a distinct shield where federal law offered none. And this broader protection was no fleeting experiment. The disjunctive language first used in 1776 survived each constitutional overhaul in 1868 and 1971. This even as the Eighth Amendment has kept its narrower phrasing since its ratification in 1789.

The timing of the 1971 constitutional revision is especially significant. By then, the Eighth Amendment had been incorporated against the states in *Robinson v.*

*California*, 370 U.S. 660 (1962), making its "cruel and unusual" standard binding on North Carolina. Yet, knowing this, the people of North Carolina *again* reaffirmed the broader "cruel or unusual" language in Section 27. This decision is critical because it shows that even with the federal Eighth Amendment now in force, North Carolina's citizens chose not to rely solely on federal protections. Instead, they reaffirmed their independent constitutional shield, ensuring that Section 27 provided greater or at least distinct protections than the Eighth Amendment. This choice to keep distinct language after incorporation underscores yet another rejection of federal uniformity on this issue.

Why, then, should North Carolina's broader constitutional language be tethered to a federal provision that our state deliberately avoided? The people of North Carolina made their choice—three times, across almost as many centuries. They rejected the federal phrasing every time, selecting and retaining language distinct from the Eighth Amendment. Yet the majority treats the people's repeated choices as if they mean nothing.

Rather than give independent weight to Section 27, the majority effectively writes it out of the Constitution. It shifts focus to Article XI, Section 1, which provides:

> The following punishments only shall be known to the laws of this State: death, imprisonment, fines, suspension of a jail or prison term with or without conditions, restitution, community service, restraints on liberty, work programs, removal from office, and disqualification to hold and enjoy any office of honor, trust, or profit under this State.

N.C. Const. art. XI, § 1.

The majority purports to harmonize that provision with Section 27. Reasoning that Article XI "prescribe[s] the outer limits on punishment," the majority concludes that "any punishment within that outer limit"—that is, mentioned in Article XI—is "inherently not 'cruel or unusual' in a constitutional sense." Section 27, in other words, has no force on its own. So long as a statute prescribes a punishment listed in Article XI, neither that statute nor a sentence imposed under it can be cruel or unusual. That rule, says the majority, does not distinguish between juveniles and adults. Because Article XI lists death and imprisonment without limiting punishments based on an offender's age, the majority concludes that JLWOP cannot violate Section 27. This conclusion is flawed in both reasoning and result.

For one, the majority ignores the structural and functional differences between Article XI and Section 27. Article XI, Section 1 enumerates the forms of punishment the state may impose—death, imprisonment, fines, and others. It is a catalog of permissible options, meant to prevent the state from reviving archaic punishments like branding or the stocks. *See* Albert Coates, *Punishment for Crime in North Carolina*, 17 N.C. L. Rev. 205, 206 (1939). But this list is not a constitutional blank check. It merely describes what is permissible in *kind*—not what is proportional or reasonable in degree.

That task belongs to Section 27. As this Court has repeatedly emphasized, Section 27 sets substantive limits on *how* and *on whom* punishments may be applied. *See State v. Driver,* 78 N.C. 423, 430 (1878) (exhorting "our duty so to declare" that a

sentence of five-years imprisonment for assault and battery "is not only 'unusual' but unheard of, and that it is 'cruel' "). Yes, the legislature enjoys broad authority to define the scope of criminal penalties. But the nature of constitutional rights limits that discretion. *State v. Griffin*, 190 N.C. 133, 137 (1925). Section 27 fills that role here, requiring that "a criminal sentence fixed by the legislature must be proportionate to the crime committed." *State v. Green*, 348 N.C. 588, 609 (1998), *cert. denied*, 525 U.S. 1111 (1999), *overruled on other grounds*, *State v. Kelliher*, 381 N.C. 558 (2022). This means that a penalty listed in Article XI must, in application, be reasonable and proportionate to the offender and the offense. *See State v. Woodlief*, 172 N.C. 885, 891 (1916) ("Whether the punishment [i]s cruel or unusual depends upon the nature of the crime and the circumstances under which it was committed and other relevant facts."); *State v. Lee,* 166 N.C. 250, 257 (1914) (noting constitutional concerns because a sentence did "not commend itself to us as being at all commensurate with the offense," since "neither aggravation nor circumstances" justified that degree of severity).

To borrow an example, "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual." *Robinson*, 370 U.S. at 667. In practice, though, "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* The same reasoning applies here. Section 27 ensures that a punishment authorized in *form*—be it imprisonment, death, or a fine— is not "excessive, cruel and unusual" in application. *See Driver*, 78 N.C. at 426; *accord*

*State ex rel. Bryan v. Patrick*, 124 N.C. 651, 662 (1899) ("Bail may be required, fines imposed, and punishments inflicted, but if they are excessive, unusual, or grossly unreasonable, a remedy will be found under such provisions of the organic law."). Section 27's layered relationship with Article XI thus constrains the government's power to punish—specifying the range of criminal sanctions while forbidding excessive and disproportionate punishment. *State v. Burnett*, 179 N.C. 735, 741 (1920) (explaining that Article XI and Section 27 are "both restrictive of the severity of punishment" and circumscribe the legislature's choices about "the question of crime, and its punishment and whether to impose or withdraw it").

Constitutional structure reinforces this point. Article I, the Declaration of Rights, is the bedrock of individual liberties in North Carolina. Our cases enshrine "the supremacy of rights protected in Article I" as a core principle of the state's constitutional framework. *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992). These rights were crafted to ensure that no actor invested with the powers of the state— whether legislative, executive, or judicial—could violate them. *Id.* Indeed, Article I was so important to the framers that they approved it "the day before the Constitution itself was adopted," underscoring its primacy. *Id.* at 782. Rights like Section 27 are thus "logically, as well as chronologically, prior to the constitutional text." John V. Orth & Paul M. Newby*, The North Carolina Constitution* 5–6 (2d ed. 2013).

Like other provisions following Article I, Article XI deals with the mechanics

of governance and spells out the state's powers and duties. It delineates the range of available punishments but does not—and cannot—supersede the rights enshrined in the Declaration of Rights. *See Blankenship v. Bartlett*, 363 N.C. 518, 525 (2009) (explaining that the right to vote for superior court judges guaranteed in Article IV "must be construed in conjunction with the Equal Protection Clause" in Article I, Section 19 to "prevent internal conflict"); *Stephenson v. Bartlett*, 355 N.C. 354, 378 (2002) (construing constitutional provisions in Article II "in conjunction with" a provision in Article I "in such a manner as to avoid internal textual conflict"); *accord In re Peoples,* 296 N.C. 109, 159–63 (1978). To suggest otherwise would invert the Constitution's design, downgrading fundamental rights to second-class status. This principle is grasped in every other realm of constitutional law. By analogy, imagine if a statute reserved life imprisonment for defendants of a particular race or gender. Although "imprisonment" is certainly listed in Article XI, that statute would violate Article I's guarantees of equal protection. Article XI does not override these fundamental safeguards. The same logic applies here: Section 27 acts as a substantive limit on the punishments authorized by Article XI, ensuring they comply with constitutional standards of reasonableness and proportionality. *Cf. In re Watson*, 157 N.C. 340, 350–51 (1911) (reasoning that a statute allowing civil detention for an offense far longer than the possible range of criminal sanctions "would be violative of section 14 of the Bill of Rights, which prohibits 'cruel or unusual punishment' ").

The majority, however, flattens these distinctions. Rather than harmonize Section 27 with Article XI, it reads the latter to swallow the former. If a statute allows a punishment listed in Article XI, the majority says, Section 27 vanishes from the analysis. In the majority's hands, Section 27 becomes a redundancy—a hollow phrase offering no protection beyond the mechanical enumeration in Article XI. The majority thus retreats from the basic principle that constitutional provisions have independent significance. *See Blankenship*, 363 N.C. at 525; *Stephenson*, 355 N.C. at 378.

Compounding that error, the majority ignores the broader constitutional framework governing punishments and juveniles. The punishments listed in Article XI, Section 1 do not stand alone; they are constrained by other provisions and broader constitutional values. For that reason, the "best way" to understand constitutional language "is to read it contextually and to compare it with other words and sentences with which it stands connected." *See State ex rel. Martin*, 325 N.C. at 449 (quoting *State v. Emery*, 224 N.C. 581, 583 (1944)). Viewing Article XI, Section 1 in context confirms that the legislature's authority is bounded and that age matters to a punishment's permissibility.

Take Section 2 of the same Article, which explains that the "object of punishments" in North Carolina is "not only to satisfy justice, but also to reform the offender and thus prevent crime." N.C. Const. art. XI, § 2. This provision marks "the declared policy of the people of this State." *State v. Matthews*, 191 N.C. 378, 380 (1926). And that policy rejects retribution as the lone star in the penal constellation—

rehabilitation is an equally weighty constitutional value. *Pharr v. Garibaldi*, 252 N.C. 803, 810 (1960) (explaining that Article XI "expressly recognize[s] that rehabilitation of a prisoner as well as punishment for past criminal conduct is a proper function" of the justice system). Section 2 is not just a lofty aspiration, but a substantive limit on the types of punishment the state can impose. By its own terms, for instance, the provision cites the principle of rehabilitation as a limit on death-eligible crimes. But Section 2 applies to all "punishments," and this Court has read its prescriptive terms to require sentencers to ensure "not only that the punishment may fit the crime, but also that it may be adapted to the purposes of the State, in dealing with those who have violated its laws." *Matthews*, 191 N.C. at 380.

This focus on rehabilitation carries special significance for juvenile offenders. By their nature, children are uniquely vulnerable and capable of change. *See, e.g., Burnett*, 179 N.C. at 741–42. Article XI, Section 4 contemplates this reality, instructing the State to care for vulnerable groups, including orphans, not only as a moral obligation but as a hallmark of a civilized society. N.C. Const. art. XI, § 4; *see In re Watson*, 157 N.C. at 350. In line with that truth, decades-worth of cases have recognized the unique considerations involved in juvenile punishments—including their heightened vulnerability and capacity for reform. *See id.*; *Burnett*, 179 N.C. at 741; *State v. Frazier*, 254 N.C. 226, 229 (1961); *In re Vinson*, 298 N.C. 640, 666 (1979).

The same principles prompted this Court's more recent recognition that "life without parole sentences for juveniles should be exceedingly rare and reserved for

specifically described individuals." *State v. James*, 371 N.C. 77, 96–97 (2018). That is so, we have explained, because juveniles are "inherently malleable" and have a "heightened capacity for change." *Kelliher*, 381 N.C. at 585–86. And because age matters to the "object of punishments" guiding our penal philosophy, age matters to whether a punishment is "cruel or unusual" under Section 27. *Id.* at 585; *see also In re Watson*, 157 N.C. at 350 ("[A] system which does no more than measure the days and years, which must be paid by him who has violated law, 'to satisfy justice,' is a survival of the days when the only object of punishment was vengeance."). For the "vast majority of juvenile offenders," then, JLWOP is cruel because it is misaligned with the "penological functions enumerated in North Carolina's Constitution":

> Given juveniles' diminished moral culpability, it is unjustifiably retributive; given juveniles' heightened capacity for change, it unjustifiably disavows the goal of reform.

*Kelliher*, 381 N.C. at 585–86; *see also Miller v. Alabama*, 567 U.S. 460, 473 (2012) ("Life without parole forswears altogether the rehabilitative ideal. It reflects an irrevocable judgment about an offender's value and place in society, at odds with a child's capacity for change." (cleaned up)).

Other provisions emphasize the salience of youth to our constitutional system. Consider Article I, Section 15, which guarantees the right to education, or Article IX, Section 1, which underscores the essential role of education in fostering good government and happiness. N.C. Const. art. I, § 15; N.C. Const. art. IX, § 1. These provisions reflect North Carolina's "constitutionally expressed commitment to

nurturing the potential of all our state's children." *Kelliher*, 381 N.C. at 586; *see also id.* ("Our constitution's recognition that the promotion of education generally, and educational opportunity in particular, is of paramount public importance to our state reflects the understanding that our collective citizenry benefits when all children are given the chance to realize their potential." (cleaned up)). They also dismantle the majority's argument in two ways. First, they highlight our state's distinctive duty to its youth—a commitment that goes beyond anything found in the Federal Constitution. Second, they show that a constitutional provision need not explicitly mention age to account for it. Neither Article I, Section 15 nor Article IX, Section 1 mentions "children" by name, but this Court has long recognized that their focus is on school-aged youth. *See, e.g., State v. Williams*, 253 N.C. 337 (1960); *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 639–40 (2004). These provisions show juveniles' special place in North Carolina's legal framework. By ignoring this context, the majority reduces the Constitution to a patchwork of disconnected clauses, rather than the cohesive framework it was meant to be.

Aside from its methodological flaws, the majority's interpretation also raises separation of powers concerns. In practice, the majority reduces section 27 to a rubber stamp of any punishment authorized by the legislature, so long as it is enumerated in Article XI. By doing so, the majority effectively kneecaps the judiciary's role as the guardian of constitutional rights, instead granting lawmakers carte blanche to define the scope of constitutional limits on punishments. This is an inversion of

constitutional design.

It is true that penal policy is primarily entrusted to the General Assembly. This Court has therefore tread cautiously in that domain, cognizant of the legislature's policymaking authority "to define crimes and fix their punishment." *Griffin*, 190 N.C. at 137 (cleaned up). But that discretion, though broad, is not limitless—it must yield if it "encounters in its exercise a constitutional prohibition." *Id.* (cleaned up). When penal policy collides with fundamental rights, we have explained, the "legislative power is brought to the judgment of a power superior to it for the instant." *Id.* (cleaned up). In those cases, the "judiciary must judge" those constitutional limits as part of its "legal duty, strictly defined and imperative in its direction." *Id.* (cleaned up). For that reason, this Court has never relinquished its duty to enforce Section 27 and shield citizens from cruel or unusual punishment. *See Woodlief*, 172 N.C. at 891. In some cases, we have vindicated that constitutional guarantee by deeming sentences as excessive or unreasonable. *Driver*, 78 N.C. at 430; *State v. Smith*, 174 N.C. 804, 805 (1917); *State v. Tyson*, 223 N.C. 492 (1943); *State v. Blackmon*, 260 N.C. 352 (1963). And even when affirming the legislature's choice of punishment, this Court has recognized the "frequently enunciated" constitutional "principle that a criminal sentence fixed by the legislature must be proportionate to the crime committed." *Green*, 348 N.C. at 609.

The majority suggests that judicial enforcement of Section 27 sidelines the people and subverts our constitutional order. It warns of judges deciding, "without

direction from the people, when the General Assembly's prescribed punishments have become cruel or unusual." But Section 27 *is* the people's direction—it reflects an abiding limit on the state's power to punish.

What this Court has made clear—and what the majority ignores—is the very purpose of North Carolina's Declaration of Rights: to secure fundamental rights "against state officials and shifting political majorities" by "limit[ing] our actions as the body politic." *Corum*, 330 N.C. at 787–88. Constitutional provisions like Section 27 thus inscribe the people's profound, enduring judgments—their commitment to core principles and the lines they refuse to let the government cross. *See id*. It "is the judiciary's responsibility to guard and protect those rights," *id*. at 785, in line with the "function and traditional role of the courts in North Carolina's constitutional democracy," *id*. at 787; *accord State v. Jackson*, 348 N.C. 644, 648 (1998); *Stanmire v. Taylor*, 48 N.C. 207, 211 (1855). Indeed, the availability of judicial review "lies at the heart of what it means to have a constitution"; rights "are nothing more than aspirational value statements" if there is nothing to vindicate them. *See McKinney v. Goins*, No. 109PA22-2 (N.C. Jan. 31, 2025) (Earls, J., concurring in result only). So enforcing Section 27 does not discard the people's will—it affirms it, by upholding the protections they deliberately placed beyond the reach of transient political majorities.

This principle guides the analysis of Section 27, which, by its plain language, ties its protections to the world in which it is applied. A punishment is "unusual" if it deviates from the penalties imposed on similar offenders for similar crimes. *See*

*Driver*, 78 N.C. at 426; *id.* at 430. A punishment is "cruel" if it inflicts gratuitous suffering that exceeds what is necessary to serve the Constitution's enumerated goals of punishment: "satisfy[ing] justice" and "reform[ing] the offender." N.C. Const. Art. XI, § 2; *Kelliher*, 381 N.C. at 586 ("Punishment which does not correspond to the penological functions enumerated in North Carolina's Constitution is cruel."). When judges evaluate whether a punishment meets these constitutional aims, they do not rewrite Section 27. They apply it as written, extending its principles to the present day and as the people directed. That is not overreach, but faithful execution of the judiciary's duty.

The majority today retreats from that obligation. By reducing Section 27 to a mere restatement of Article XI, the majority allows the legislature to define the constitutional limits of its penal authority. In practice, that decision surrenders the judiciary's "responsibility to protect the state constitutional rights of the citizens," *Corum*, 330 N.C. at 783, and cedes Section 27's limits to the very body it was meant to restrain.

**B. History**

After dismissing Section 27's text, the majority turns to the "historical context in which the People of North Carolina enacted it." This exercise, we are told, seeks to "isolate" the provision's meaning at the time of ratification. The majority seems to fix its gaze on the 1776 Constitution, though it does not explain why that moment should control. I address the deep flaws in this approach elsewhere. *See McKinney*, No.

109PA22-2, slip op. at 37-38, 78-80 (Earls, J., concurring in result only). The same critiques hold here.

To start, the majority's historical anchor is telling. It focuses on the 1776 Constitution, the only version never directly voted on and approved by the electorate. That document, crafted by the Fifth Provincial Congress, was adopted into law "in December, 1776, without submission to the people." John L. Sanders, *The Constitutional Development of North Carolina: A Brief History of the Constitutions of North Carolina, in* North Carolina Government 1585–1974: A Narrative and Statistical History 795 (John L. Cheney Jr. ed., 1981). In many ways, this charter reflected the worldview of its makers, creating "a republic of free males with full participation reserved for property owners." Orth & Newby, at 3. Soon after its ratification, the "undemocratic features" of the 1776 Constitution—"especially its property and religious qualifications for officeholding"—stoked "sectional controversies" and "disillusioned the masses." Hugh Talmage Lefler & Albert Ray Newsome, *The History of a Southern State: North Carolina* 229 (3d ed. 1973).

Compare that with the state's later constitutions. In 1868, North Carolina rewrote its charter with input from a diverse delegation. *See* Orth & Newby, at 19. This new constitution abolished property qualifications for voting, expanded women's property rights, and charted a more inclusive path. *Id.* And for the first time, it was ratified by the people. The same is true of the 1971 Constitution, the version that governs us today. These later constitutions bear the mark of broader participation

and more equitable values.

So why is Section 27 frozen in 1776? Why does the majority look to the most exclusive, least democratic version of our Constitution as its guiding star? These are not idle questions. If, as the majority suggests, constitutional meaning is located by "trac[ing] a constitutional provision back in time to its earliest appearance in our constitutions," then the past will always define our present. *See McKinney*, No. 109PA22-2, slip op. at 38 (Earls, J., concurring in result only). This is a recipe for stagnation and injustice. History is not, as the majority frames it, a neutral arbiter. It is a mirror of the values of those who shaped it, reflecting their priorities and exclusions. To rely on history uncritically is itself a choice—a deliberate selection about which values and assumptions we carry forward into modern law.

The majority's reliance on *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144 (1838), underscores the perils of this approach. In *Manuel*, this Court upheld a law allowing county sheriffs to "hire out" poor, non-white defendants who could not pay criminal fines. *Id.* at 148. The law targeted free people of color, using their race and poverty as the "aggravating circumstances of [the] crime." *Id.* at 161. Yet the Court deemed this punishment a valid legislative choice within "the great powers confided to the Legislature for the suppression and punishment of crime." *Id.* at 163. Later cases, like the majority today, cite *Manuel* to argue that, considering the legislature's policymaking authority, punishments that are statutorily allowed and listed in Article XI cannot be "cruel or unusual."

*Manuel* is indeed instructive—but not in the way the majority suggests. It shows, in essence, the dangers of using history as the yardstick for modern constitutional rights. *Manuel*'s deference to legislative discretion was not neutral—it reflected a discriminatory view of who deserved constitutional protections and who did not. According to *Manuel*, the legislature had the authority to "apportion punishments" based on an offender's "condition, temptations to crime, and ability to suffer." *Id.* That discretion allowed the legislature to vary criminal penalties based on race, gender, and wealth. A punishment's cruelty, in other words, was a sliding scale based on a defendant's place in the social hierarchy:

> What would be cruelty if inflicted on a woman or a child[ ]
> may be moderate punishment to a man. What might not be
> felt by a man of fortune would be oppression to a poor man.
> What would be a slight inconvenience to a free negro might
> fall upon a white man as intolerable degradation.

*Id.* at 163–64.

Applying that framework, this Court found nothing "cruel or unusual" about a statute subjecting poor, non-white defendants to quasi-enslavement. For that punishment, as *Manuel* saw it, was simply a permissible exercise of legislative discretion that the judiciary should not second-guess. *See id.* at 162–63. The rule extracted from *Manuel*—that punishments authorized by the legislature are policy judgments beyond constitutional reach—rests on this discriminatory logic. There is no reason why a two-centuries-old case, infected with antebellum prejudice and interpreting a since-eclipsed version of the Constitution, should dictate the meaning

of Section 27 today.[6] In a democracy, especially, the law should not "freeze[ ] the meaning of our Constitution in amber according to narrow circumstances in centuries past." *McKinney*, No. 109PA22-2, slip op. at 38 (Earls, J., concurring in result only).

## C. Precedent

The majority closes with a selective and incomplete account of our Section 27 jurisprudence. It declares, in sweeping terms, that "in recognition of the supremacy of the Federal Constitution," this Court has "routinely" interpreted Section 27 in lockstep with the Eighth Amendment. The majority frames this as an unbroken historical tradition. But this recitation of our caselaw is conspicuously incomplete. The majority relies on outdated precedent (its most recent opinion of the Court is from 1998), while ignoring key inflection points in our jurisprudence. More recent

---

[6] The majority dismisses the significance of North Carolina's more recent constitutions, claiming that because Section 27's "modern text" mirrors earlier versions, its analysis must begin—and seemingly end—with the 1776 Constitution. But even if the language of Section 27 resembles its predecessors', it does not mean its meaning and scope are fixed in the 18th century. When the people of North Carolina chose to preserve Section 27 through the constitutional milestones of 1868 and 1971, they deliberately reaffirmed its enduring principles and the limits it set on state power. The historical trajectory of Section 27 thus reflects its abiding relevance, not its fossilization in an 18th-century mold.

The majority avoids this reality by reducing the 1971 Constitution to a mere clerical exercise, dismissing it as nothing more than an editorial pruning of prior provisions. That view is historically inaccurate, as I explain elsewhere. *See McKinney*, No. 109PA22-2, slip op. at 80-84 (Earls, J., concurring in result only). As well, the majority's brand of "extreme originalism" rests on a deeper normative flaw. *See id.* The majority warns against "pretend[ing] that constitutional history began in 1971." But its approach suggests that constitutional history *stopped* in 1776. By centering its analysis of Section 27 in that provision's earliest form, the majority "bring[s] the law and constitutional protections back to that point in this state's history when slavery was legal and women could not own property or vote." *See McKinney*, No. 109PA22-2, slip op. at 38 (Earls, J., concurring in result only). I cannot subscribe to that mode of constitutional interpretation.

decisions—including *James*, 371 N.C. 77; *Kelliher*, 381 N.C. 558; and *Conner*, 381 N.C. 643—repudiated the flawed reasoning of earlier cases and rejected the lockstep approach the majority now resurrects.

Consider *Green*—a repeat player in the majority's analysis. 348 N.C. 588. When this Court decided that case in 1998, we did indeed take a lockstep approach, treating Section 27 as a carbon copy of the Eighth Amendment. *Id.* at 603. *Green* involved a thirteen-year-old defendant sentenced to life imprisonment for a first-degree sexual offense. *Id.* at 592–94. This Court acknowledged the textual differences between Section 27 and the Eighth Amendment but declined to give those differences meaning. *Id.* Instead, we relied on the supposed "historical[ ]" practice of treating the two provisions the same. *Id.* Justice Martin, writing in another case, urged this Court to take seriously the disjunctive phrasing of "cruel or unusual punishments" in Section 27. *See Medley v. N.C. Dep't of Correction*, 330 N.C. 837, 846 (1992) (Martin, J., concurring). But *Green* declined that request, sensing no "subsequent movement" towards that position by this Court or a "compelling reason" to adopt that view. *Green*, 348 N.C. at 603 n.1.

But even *Green* understood that it was a product of its time. The opinion itself acknowledged the then-prevailing belief that "serious youthful offenders must be dealt with more severely" but predicted that "[t]hese tides of thought may ebb in the future." *Id.* at 608. And ebb they did. In the years since *Green*, this Court has retreated from *Green*'s rigid framework, recognizing its failure to account for evolving

understandings of adolescence and punishment.

In 2018, for instance, our decision in *James* acknowledged that "children are different" from adults in ways that profoundly matter to criminal sentencing. 371 N.C. at 96 (quoting *Miller*, 567 U.S. at 480). Though *Green* downplayed juveniles' unique traits, *James* recognized that a child's "chronological age and its hallmark features" undermine the penological justifications for imposing extreme sentences. *Id.* The Court upheld North Carolina's *Miller*-fix statute by interpreting it to align with modern principles—that life without parole should be an exceedingly rare sentence for juveniles. *See id.* at 92–93. This marked a shift away from *Green*'s rationale, focusing on the unique developmental characteristics of juveniles as informed by modern science and legal developments.

*Kelliher* built on this evolution, decisively breaking from the lockstep approach embraced by past cases. *See* 381 N.C. at 579–81. That case addressed *Green*'s outdated logic directly, explaining that its depiction of children as "predators" fundamentally misunderstood the nature of childhood and, in some cases, reflected racialized stereotypes. *Id.* at 582–83; *see also The Superpredator Myth, 25 Years Later*, Equal Just. Initiative (Apr. 7, 2014), https://eji.org/news/superpredator-myth-20-years-later); *State v. Null*, 836 N.W.2d 41, 56 (Iowa 2013) (noting that the propagators of the juvenile "predator" theory ultimately acknowledged that "the[ir] predictions did not come to pass, that juvenile crime rates had in fact decreased over the recent decades, that state legislative actions in the 1990s were taken during an

environment of hysteria featuring highly publicized heinous crimes committed by juvenile offenders, and that recent scientific evidence and empirical data invalidated the juvenile superpredator myth." (cleaned up)). Relying on "the science of adolescent brain development that this Court has previously recognized," *Kelliher* underscored that juveniles are categorically less culpable than adults and possess a heightened capacity for reform. *See* 381 N.C. at 587. It also emphasized that Article I, Section 27's use of the phrase "cruel or unusual punishments" is meaningfully distinct from the Eighth Amendment's "cruel and unusual punishments." *Id.* at 580–81. That disjunctive phrasing—alongside the "constitutional commitments to rehabilitating criminal offenders and nurturing the potential of all of North Carolina's children"—demanded an independent analysis, not the mechanical adoption of federal precedent. *Id.* at 587.

*Conner*—issued the same day as *Kelliher*—reaffirmed the unique constitutional protections afforded by Section 27. 381 N.C. at 667–68. Like *Kelliher, Conner* emphasized how the language of the "state constitutional provision abrogates a range of sentences which is inherently more extensive in number by virtue of the provision's disjunctive term 'or' than the lesser amount of sentences prohibited by the federal constitutional amendment due to its conjunctive term 'and.' " *Id.* at 667; *see also id.* at 667–68 ("On its face, the Constitution of North Carolina appears to offer criminal defendants—such as juvenile offenders—more protection against extreme punishments than the Federal Constitution's Eighth Amendment, because the

Federal Constitution requires two elements of the punishment to be present for the punishment to be declared unconstitutional ('cruel and unusual'), while the state constitution only requires one of the two elements ('cruel or unusual')."). Also like *Kelliher*, *Conner* explained why past cases—*Green* in particular—no longer controlled. *See id.* at 668 n.14. Issued in 1998, that decision "preceded the United States Supreme Court decisions in *Roper*, *Graham*, *Miller*, and *Montgomery*," and reflected a "view of juvenile offenders" that "is in direct conflict with subsequent research and with our nation's evolution in its understanding of the culpability of juvenile offenders." *Id.* Thus, as these cases show, the reasons that once justified lockstepping—a lack of legal "movement toward" and "compelling reasons" for reading Section 27 differently—no longer hold. *Cf. Green*, 348 N.C. at 603 n.1.

Rather than meaningfully grapple with this precedent, the majority distorts it. It glosses over the substance of *Kelliher* before reducing that decision to a single fragment: that "Article I, Section 27 requires a trial court to expressly find that a juvenile homicide offender is one of those exceedingly rare juveniles who cannot be rehabilitated before sentencing him to life without parole." That portion of *Kelliher*, says the majority, was "unnecessary in determining the outcome of the case" and therefore nonbinding dicta.

The irony, of course, is that the same critique dooms most of the majority's own opinion. At any rate, the majority mischaracterizes what parts of *Kelliher* are "arguably applicable" here. For *Kelliher* expressly rejected a lockstep approach to

Section 27 and held that this provision "offers protections distinct from, and in this context broader than, those provided under the Eighth Amendment." *Kelliher*, 381 N.C. at 579. That conclusion was not an aside—it was central to this Court's "ultimate holding." *Cf. Amos*, 331 N.C. at 359. *Kelliher* held that the Eighth Amendment and Section 27 prohibit a sentence of JLWOP if a juvenile, like Mr. Kelliher, is "neither incorrigible nor irredeemable." *Kelliher*, 381 N.C. at 585. It also held that consecutive life-with-parole sentences can amount to *de facto* JLWOP under Section 27. *See id.* at 560; *see also id.* at 587–90. That second holding, rooted entirely in the state Constitution, was key to the first, since the U.S. Supreme Court has never read the Eighth Amendment to cover *de facto* JLWOP. *See id.* at 577; *see also id.* at 597 ("For the foregoing reasons, and based specifically on our analysis of the independent protections afforded by article I, section 27 of the North Carolina Constitution, the judgment of the Court of Appeals is modified and affirmed."). To put it mildly, *Kelliher* is far more than "arguably applicable"—it rejected the majority's truncated reading of Section 27 and refused to lockstep with the Eighth Amendment.

Like the other facets of the majority's analysis, its discussion of precedent ignores the broader arc of our jurisprudence, choosing a one-sided historical narrative that cherry-picks precedent to suit its conclusion. Our cases, our Constitution, and our understanding of juvenile justice have evolved. *Compare Green*, 348 N.C. at 610 (deeming irrelevant the "special considerations due children under the criminal justice system" because a thirteen-year-old defendant's traits—including

his "difficulty controlling his temper, his previous record and his unsupportive family situation"—were "not the type attributable to or characteristic of a 'child' "), *with James,* 371 N.C. at 209 (emphasizing the "necessity for requiring sentencing authorities" to give mitigating weight to "chronological age and its hallmark features," including "immaturity," "impetuosity," "failure to appreciate risks and consequences," and "the family and home environment that surrounds the juvenile" (quoting *Miller*, 567 U.S. at 477–80) (cleaned up)). By pretending otherwise, the majority does a disservice to the law and North Carolina's unique constitutional values.

## III. Conclusion

The disposition of this case does not turn on whether Section 27 of the North Carolina Constitution provides more or less protection to juvenile defendants than the Eighth Amendment. But the majority's sweeping conclusions from isolated fragments of constitutional text are dangerous not only for what they mean about the proper way to interpret the freedoms enshrined in the North Carolina Constitution but also for how we understand the role of the judiciary. Because none of the majority's pronouncements about Section 27 are required to decide the issues before us, they are nonbinding dicta, and I concur in the result only.

Justice RIGGS joins in this concurring in the result only opinion.